JOSEPH DURST, Respondent, *v.* ANNE M. ABRASH, as Trustee under Trust Agreements Created by GEORGE ABRASH, Appellant, et al., Defendant.

First Department, October 27, 1964.

*Jules J. L. Hessen* of counsel (*Hahn, Hessen, Margolis & Ryan,* attorneys), for appellant.

*Paul R. Scott* of counsel (*Milton I. Newman* with him on the brief; *Baar, Bennett & Fullen,* attorneys), for respondent.

BREITEL, J. P. In an action for a declaratory judgment to determine that a certain purported stock sale transaction was in fact a disguise for a usurious loan agreement defendant appeals from an order denying her motion to compel arbitration (CPLR 7503, subd. [a]). Special Term denied the motion but directed a preliminary trial of the issues upon which arbitrability depends. The issue is whether the agreement to arbitrate has independent viability apart from the alleged usurious transactions so that all the issues, including the claim of usury, are for the arbitrators to determine rather than the court.

The order should be affirmed. The subsidiary agreement to arbitrate is subject to the alleged illegality of the principal agreement.

The transaction, as described by plaintiff, was a loan to plaintiff of $30,000, disguised in the form of a sale by him to defendant of 10,000 shares of Class A common stock in a close corporation. Plaintiff was required to repurchase the stock some 15 months later at a price of $5.40 per share. In addition, defendant was to receive the dividends payable on the stock, amounting to 60 cents per share, or a total of $6,000 in dividends. Consequently, under the transaction, if it was what plaintiff alleges it to be, defendant would receive interest at the rate of 80% per annum.

Simultaneously with the execution of the principal agreement in suit the parties also executed, under the same date, a paper which read as follows: " It is hereby agreed among the undersigned that any dispute, claim, or controversy arising under or pursuant to letter agreements between them dated this day, shall be settled by arbitration in New York City pursuant to the rules of the American Arbitration Association then obtaining."

The statute provides that " [w]here there is no substantial question whether a valid agreement was made or complied with * * * the court shall direct the parties to arbitrate " (CPLR 7503, subd. [a]). Whether the statute, which was adopted in its present form in 1962 and became effective September 1, 1963 (CPLR 10005), changed the law as it existed under the Civil Practice Act (§ 1450) need not be dispositive of the issue in this case. The law under the Civil Practice Act had been that a contract for the doing of an act the performance of which was prohibited by statute or was otherwise " void and unenforceable " was not enforceable in arbitration (*Matter of Exercycle Corp. [Maratta]*, 9 N Y 2d 329, 334–335; *Matter of Kramer & Uchitelle [Eddington Fabrics Corp.]*, 288 N. Y. 467, 471). In this case, concededly, there are various statutes affecting the legality or validity of usurious transactions.

If, on the other hand, CPLR changed the law then defendant's situation is the worse. The Civil Practice Act provided for the preliminary determination of a "substantial issue as to the making of the contract or submission or the failure to comply therewith" (§ 1450). The language was always troublesome and there was decisional law that the court was to decide as a preliminary matter not merely the fact of making an agreement but also whether the parties had succeeded in effecting an enforcible contract to arbitrate (see concurring and dissenting opinions in *Matter of Exercycle Corp., supra,* and the cases cited).

The language in CPLR, on the other hand, makes explicit that the preliminary question for the court is whether there is a substantial question of the existence of a "valid agreement" to arbitrate. If the statute intended the meaning normally attributed to those words there is no question that a preliminary question for the court to determine is whether or not there is a valid arbitration agreement in the first instance. Certainly, if the new statute was intended to change the law, that is the only direction in which the change points. In that case, a fortiori, an agreement to arbitrate subject to a claim of infirmity for illegality in the principal agreement involves a preliminary question to be determined by the court and not by the arbitrators.

There is some authority that the new statute, which was enacted after the *Exercycle* case, was not intended to change the pre-existing law (8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7503.02). The commentators, in supporting that view, however, cite the Second Advisory Committee Report (2d Preliminary Rep. of Advisory Comm. on Practice and Procedure, p. 135, 1958 Report of Temporary Comm. on Courts, N. Y. Legis. Doc., 1958, No. 13, p. 135). In fact, the Second Report draft of the statute did not expressly refer to the "validity" of the agreement but only to "the existence of the agreement". This language continued unchanged through the 1962 drafts even after the section had received its present designation "§ 7503" (6th Report Sen. Finance Comm., N. Y. Legis. Doc., 1962, No. 8, p. 648). It was much later in the 1962 legislative session that the language was changed to its present form referring to validity of the agreement. This, therefore, may suggest an argument that the new statute was intended to change the law, or, at least, restate the rule as generalized in the *Kramer* case (*supra*).

The rule in the *Kramer* case (referring generally to the necessity of there being a valid and enforcible contract before there

can be arbitration under a subsidiary clause) was cast in some doubt by the opinion in the *Exercycle* case (*supra*). The holding in the *Exercycle* case certainly was that common-law contract invalidity, as distinguished from public policy illegality, of a principal agreement containing an otherwise viable arbitration clause was not a preliminary matter to be determined by the court. Whether the language in CPLR was intended to overrule the holding in the *Exercycle* case, a matter which is not relevant to the issues in this case, is quite another question. It is this last question with which the commentators were primarily concerned, namely, whether technical common law contract rules (e.g., mutuality, consideration, and the like) which might leave a substantive agreement unenforcible at law did not also render a subsidiary agreement to arbitrate unenforcible.

As for the form of the agreement, it is undisputed law that a usurious agreement is invalid regardless of the form it takes and regardless of the rules governing integrated agreements. It is always possible to show that any transaction and the documents which are a part of it are illegal and unenforcible as a usurious transaction. (Restatement, Contracts, § 229, *Comment b*; § 529; cf. *Hartley* v. *Eagle Ins. Co.*, 222 N. Y. 178, 184–185; *Thurston* v. *Cornell*, 38 N. Y. 281, 285.) In such an inquiry the issue is not the interpretation of the language used but what are the facts behind the facade of language.

There is no need to consider the subtleties in the line of cases discussing whether a usurious agreement is void or voidable. That question may be important when the interest of a third party is involved. Indeed, the distinction is not important when duress or fraud is involved, although these result only in voidable agreements; the preliminary issue is still for the court (*Matter of Exercycle Corp., supra*).

Nor does any sound distinction rest on the obvious fact that different kinds of illegality may involve a lesser or greater degree of public harm. The fact is that there are many kinds of public policy illegality, other than usury, which require a positive election or an affirmative defense to render agreements subject to the infirmity unenforcible (17A C. J. S., Contracts, § 559).

In this case no third party is involved and a party to the alleged usury is asserting the illegality and unenforcibility of the agreements, both as to the principal agreement and the subsidiary agreement to arbitrate. No precedent suggests that illegality may be waived in advance. If so, such waiver would be accomplished indirectly by inserting an arbitration clause

in the otherwise illegal agreement, thus precluding court control of the public policy issue.

The separate execution of the one-sentence agreement to arbitrate any disputes which might arise under the principal agreements does not, of course, present a separable question. The papers being executed simultaneously and as part of the same transaction are to be construed together (*Nau* v. *Vulcan Rail & Constr. Co.,* 286 N. Y. 188, 197; 10 N. Y. Jur., Contracts, § 213; Restatement, Contracts, § 235, subd. [c]). If the main purpose of the transaction was illegal then the subsidiary agreements, if they are truly subsidiary, are rendered invalid by the invalidity of the principal agreement (*Manson* v. *Curtis,* 223 N. Y. 313, 324).

What the situation would be with respect to a prior general agreement between parties to arbitrate all disputes which might arise between them in a variety of transactions need not now be decided.

In *Matter of Metro Plan* v. *Miscione* (257 App. Div. 652) the precise question involved in this case was decided as an alternative holding. It was held that a principal agreement, if usurious, would render unenforcible stipulations for arbitration contained within it. It was said flatly that such a question was for the court to decide and not the arbitrators.

The most significant aspect of the matter, however, is that in *Matter of Exercycle (supra),* the court referred to the *Metro Plan* case. It was cited under the first category of cases described by the court as one in which arbitration would be preliminarily enjoined with respect to certain allegedly voidable agreements. While the category was denominated as involving fraud or duress, the *Metro Plan* case was included with a comparative reference, p. 334. Consequently, not only is the *Metro Plan* case a binding precedent upon this court but its rule is one which appears to have been expressly excepted from the principle laid down in the *Exercycle* case.

*Matter of Gale (Hilts)* (262 App. Div. 834) did not hold contrary to the *Metro Plan* case, and therefore does not impair the precedental standing of the *Metro Plan* case. There the question of illegality was raised only after award by the arbitrators. This is quite a different matter; the grounds for vacatur of an award are not identical with those which will warrant a stay of arbitration (Civ. Prac. Act, § 1462; cf. CPLR 7503, subd. [b]; 7510, 7511, subd. [b]). The award, on the facts in that case, was then supportable on the ground that the arbitrators could have found on the facts that there was no usurious transaction.

There is nothing in the decisional law or in the usury statutes which blanket the Anglo-American jurisdictions which suggests that usury involves an illegality of a lesser degree than others for the purpose of determining the enforcibility of agreements. But even this should not be critical to the determination of this case. If usurious agreements could be made enforcible by the simple device of employing arbitration clauses the courts would be surrendering their control over public policy in a way in which the Court of Appeals in the *Exercycle* case made very clear could not happen. Moreover, any one desiring to make a usurious agreement impenetrable need only require the necessitous borrower to consent to arbitration and also to arbitrators by name or occupation associated with the lending industry (cf. *Matter of Astoria Med. Group* [*Health Ins. Plan*], 11 N Y 2d 128). In this way the statutes and, where they exist, licensing agencies, would all be facilely by-passed.

The problems of usury extend well beyond larger commercial transactions to small business situations and to personal loans for those without capital. If the arbitration clause device could be thus used, all the complicated legislative distinctions in the statutes, civil and criminal,* as well as the authority of the administrative regulating agencies, would be avoided by the simplest draftsmanship. The welter of legislation in this area makes clear that the concern is one of grave public interest and not merely a regulation with respect to which the immediate parties may contract freely.

Accordingly, the order denying defendant's motion to compel arbitration pending a trial of the issues of whether the written agreements are usurious and invalid should be affirmed, with costs to plaintiff-respondent.

STEUER, J. (dissenting). We disagree to the extent that we believe all the issues are determinable by the arbitrators and that consequently Special Term should have granted the motion to compel arbitration.

We agree with the majority that two questions are presented, namely, whether CPLR changed the existing law as to the respective functions of the court and the arbitrators and whether, assuming there was no change applicable to the present situation, the question is for the court or the arbitrator. We further agree that if either of these questions is to be answered as the respondent contends, Special Term's disposition is correct. As to the first question, as we read the majority opinion the court

---

* (See, e.g., General Business Law, § 370 *et seq.*; Banking Law, §§ 108, 173, 235-b, 293-a, 352, 510-a; Penal Law, § 2400; Personal Property Law, § 46-f.)

found it unnecessary to decide, merely calling attention to respondent's position and stating that if it is correct it provides an additional ground for affirmance. While this disposition is eminently proper, it does not dispense with the necessity of our establishing our position on this phase of the legal issue presented.

Prior to the enactment of Civil Practice Law and Rules it was quite clear that before arbitration could be directed it was the duty of the court to determine whether the parties had agreed to arbitrate (*Matter of Rosenbaum* [*Amer. Sur. Co.*], 11 N Y 2d 310). This would involve a court-made determination of such questions as whether there was a meeting of the minds, and whether an apparent agreement was vitiated by fraud in the factum, duress or any other element which interdicted an offer and its acceptance (see *Matter of Lipman* [*Haeuser Shellac Co.*], 289 N. Y. 76, 79). As most agreements to arbitrate are terms in the contract which gives rise to the controversy, it was also the province of the court to determine whether that term was so understood by the parties that it could be said that they had agreed to it (*Matter of Riverdale Fabrics Corp.* [*Tillinghast-Stiles Co.*], 306 N. Y. 288). Other questions are for the arbitrators. " Once it be ascertained that the parties broadly agreed to arbitrate a dispute ' arising out of or in connection with ' the agreement, it is for the arbitrators to decide what the agreement means and to enforce it according to the rules of law which they deem appropriate in the circumstances." (*Matter of Exercycle Corp.* [*Maratta*], 9 N.Y 2d 329, 334.)

The *Exercycle* case was decided pursuant to the statutory directions contained in section 1450 of the Civil Practice Act, which limited court inquiry to any " substantial issue as to the making of the contract ". The current statutory provision (CPLR 7503) is whether there is any " substantial question whether a valid agreement was made ". The distinction between the succeeding provision and its predecessor is in the use of the word " valid ". This may refer to the making of the contract, that is, that all steps necessary to formalize an agreement were taken and nothing was done to negate the effect of those steps, or it may refer to the agreement itself — whether it is such that no legal obstacle to its enforcement can prevail. This would embrace such questions as lack of consideration, mutuality of obligation and all other situations which can serve to render what purports to be a contract obligation into a *nudum pactum*. Either interpretation is possible under the language used. If the first represents the legislative intent, no substantial change

in the law was effected.* If the latter, there has been a very substantial change indeed, not only in procedure but in substance. In very many instances the question of whether the instrument is legally enforcible or not depends on the interpretation to be put on it and this, in turn, depends most frequently on subsidiary issues of fact. The resolution of these issues determines the right to recovery. It is just those issues that the parties agreed to submit to arbitrators. If these issues are to be determined by the court, the role of the arbitrators is written out of the contract, or at least reduced to a calculation of damages. While the Legislature could, no doubt, achieve such a result if they so wished, we cannot believe that they would undertake to effect so material a change by the use of a single word in a practice statute.

We turn now to the more difficult question of whether illegality under the rule of the *Exercycle* case is arbitrable or whether, when such a claim is asserted, the court must first find the claim unjustified before arbitration can be ordered. The general rule is, and always was, that illegality negates the existence of the contract and hence there is nothing to arbitrate (*Matter of Kramer & Uchitelle*, 288 N. Y. 467). However, illegality is a very broad term and when applied to contracts is used to cover a multitude of situations. These vary from agreements which are intended to carry out a criminal result (i.e., an agreement to divide the spoils of a robbery) to one that runs counter to a statute regulating trade. The nature of the illegality involved can and does have some effect on the rights created by the contract and the ability to enforce it. Every contract to which a claim of illegality in the broad meaning of that word might be asserted is not, *ipso facto*, a nullity, nor is arbitration of questions arising out of it interdicted. That result only attends such contracts whose performance would call for acts which run counter to our public policy. (See *Matter of Exercycle, supra*, p. 335.) And this limitation of the effect of the generic term " illegality " fits in perfectly with our legal concepts. As noted, arbitrators, where they are empowered to act, may enforce an agreement under any rule of law that they deem appropriate. It would be an unthinkable travesty to allow them to apply a rule which directed enforcement of acts, or to give

---

* While there is very little proof of the legislative intent dehors the statute, Professor Weinstein states that no change in the substantive law was intended (8 Weinstein-Korn-Miller, N. Y. Civ. Prac., p. 75–62). (But see Thornton, Practice Commentary, § 7503, McKinney's Cons. Laws of N. Y., Book 7B, CPLR, p. 488; Falls Jr., Arbitration Under the Civil Practice Law and Rules in New York, IX New York Law Forum 335, 346 *et seq.*)

damages for the failure to perform acts which our public policy forbade. No such difficulty is presented where the acts called for do not offend against our public policy.

So it becomes necessary to determine whether the collection of a usurious rate of interest is such an act. We submit it is not. Usury means a stipulation for interest in excess of a statutory rate. A contract tainted with usury occupies, in the law of this State at least, a rather peculiar situation. By statute, certain, but not all, such contracts, are declared to be void (General Business Law, § 373*). Nevertheless, from the earliest times it has been stated that " [t]he contract is not absolutely *void*, but only *voidable*, at the election of the borrower, or those who are privies  *  *  * with him: hence, no other party can make the objection." (*Williams* v. *Tilt*, 36 N. Y. 319, 325.) The Court of Appeals has repeatedly reaffirmed this proposition, even to the quotation, long after usurious contracts were declared void by statute (*Lipedes* v. *Liverpool & London & Globe Ins. Co.*, 184 App. Div. 332, affd. 229 N. Y. 201, citing *Chapuis* v. *Mathot*, 91 Hun 565, affd. 155 N. Y. 641, which cites the quotation with approval). That the defense is peculiar to the borrower is still the law (*Broad & Wall Corp.* v. *O'Connor*, 13 A D 2d 462). Furthermore, our courts are not wedded to the principle that they will throw out all cases where a rate in excess of our statutory rate is called for. If the obligation arises outside the State, it can be enforced here despite the fact that the interest called for is in excess of our legal rate (*City Nat. Bank in Miami* v. *Lake Constr. Co.*, 227 App. Div. 85). It has also long been our policy, as it is that of many States, that where a contract calling for interest has relation to several States, the law of the State which will sustain the contract (i.e., allows a rate of interest equal to or exceeding the contract rate) will be applied (*Cutler* v. *Wright*, 22 N. Y. 471; Leflar, Conflict of Laws, § 131; Ann. 125 A. L. R. 482, Conflict of Laws as to Usury). These considerations are no mere subtleties as to whether a contract is void or voidable. They present a very clear picture of our public policy. They show that the making of an agreement that calls for interest in excess of our statutory rate does not contravene our public policy but that in certain of these contracts the court will not, under certain circumstances, enforce their performance. It would follow that there would be no objection to allow such contracts to go to arbitration.

---

* This section will very shortly become part of the General Obligations Law, § 5-511.

In reaching this conclusion we are not unaware of the holding in *Matter of Metro Plan* v. *Miscione* (257 App. Div. 652). As pointed out in the majority opinion, this is an alternative holding. It was also held that the contract did not, under the limited arbitration clause, provide for arbitration of the question. We submit that at the time the case was decided the law as to what was arbitrable had not been developed to its present degree. As to its citation in the *Exercycle* case, the manner is fairly set out in the majority opinion, but we do not conclude from that that the Court of Appeals intended to approve the specific holding.

Our courts have increasingly adopted the principle that where the parties have agreed upon arbitration as the forum for their disputes, the courts will not place obstacles in the way of that agreement. The nature of the contract here is in dispute. It is not controverted that this very question, the nature of the contract, is left to arbitration. If we can, we should give recognition to this agreement. If it should eventuate that the arbitrators find an agreement that contravenes our policy but, nevertheless, decree enforcement, any resulting question can be determined on the motion to confirm the award (*Matter of Gale,* 262 App. Div. 834). But the factual questions upon which the legality or illegality of the contract depends are for the arbitrators (*Matter of Goodman* v. *Lazrus,* 15 A D 2d 530). This is exactly what the parties contracted for. Moreover, it is the only way consonant with our existing procedure in which their indisputable agreement to arbitrate the underlying questions of fact — which will determine whether this is in fact a usurious contract — can be given effect.

In the view we take it is unnecessary to decide whether the agreement to arbitrate should be considered separate and apart from the agreement in dispute. Naturally, if it is considered separate, the first question is obviated (17A C. J. S., Contracts, § 515[5]). No doubt exists that the agreement to arbitrate is a valid agreement.

Order denying motion for arbitration pending a trial of certain issues should be reversed and the motion granted.

VALENTE and McNALLY, JJ., concur with BREITEL, J. P.; STEUER, J., dissents in opinion in which EAGER, J., concurs.

Order, entered June 15, 1964, denying defendant's motion to compel arbitration pending a trial of the issues of whether the written agreements are usurious and invalid, affirmed, with $30 costs and disbursements to respondent.