Charles C. **WELCH**, Plaintiff-Appellant,

v.

**CARSON PRODUCTIONS GROUP, LTD.**, Defendant-Appellee.

No. 643, Docket 85–7774.

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1986.

Decided May 16, 1986.

Peter Campbell Brown, New York City (James P. Costello, New York City, of counsel), for plaintiff-appellant.

Stephen F. Huff, New York City (Andres J. Valdespino, Pryor, Cashman, Sherman & Flynn, New York City, of counsel), for defendant-appellee.

Before OAKES, WINTER and MINER, Circuit Judges.

MINER, Circuit Judge:

Charles Welch appeals from a judgment of the United States District Court for the Southern District of New York (Kram, J.) directing a verdict, Fed.R.Civ.P. 50(a), in favor of appellee Carson Productions Group, Ltd. ("Carson") on claims arising from Carson's allegedly unauthorized national television broadcast of two television commercials in which Welch performed. Welch claimed that the use of these commercials without his express written consent violated sections 50 and 51 of the New York Civil Rights Law. N.Y.Civ. Rights Law §§ 50–51 (McKinney 1976 & Supp. 1986). The district court concluded that the collective bargaining agreement between the Screen Actors Guild ("SAG"), Welch's union, and various television producers, authorized Carson's use of the com-

mercials.[1] For the reasons set forth below, we affirm.

## I. BACKGROUND

Charles Welch is a professional actor, currently appearing as the "Pepperidge Farm Man" in television commercials advertising Pepperidge Farm baked goods. Throughout his career, Welch has appeared in over seventy commercials advertising a wide assortment of products and services. Pertinent to this litigation, he appeared in a 1967 commercial entitled "Disadvantages," advertising Benson & Hedges cigarettes, and in a 1972 commercial entitled "Tap Dancer," advertising United Airlines. His appearance in each commercial was fleeting, lasting only five seconds and one second, respectively.

In 1982, Carson began production of a television program entitled, "Television's Greatest Commercials—Part II," starring Ed McMahon and Mariette Hartley. The program was designed as a collection of well-known commercials shown on television over the past thirty years. "Disadvantages" and "Tap Dancer" were among the commercials to be used in the program.

As part of the preparation for the reuse of the commercials, Carson contacted SAG in order to determine the manner in which those actors who had appeared in the selected commercials should be compensated for the reuse of the footage. SAG advised Carson that it would have to comply with the terms of the 1977 Screen Actors Guild Television Agreement ("Green Book"). Section 36 of that agreement, entitled "Reuse of Photography or Sound Track," provides that a producer may not reuse television film of an actor in a manner other than that for which the actor originally was employed "without separately bargaining with the player and reaching an agreement regarding such use...." Green Book § 36(a). The agreement fur-

---

1. Subsequent to the district court's decision, Welch commenced an action in New York State Supreme Court against Philip Morris, Inc., the original producer of one of the commercials at issue, alleging similar violations of the New York Civil Rights Law. The state court granted summary judgment to the defendant on collateral estoppel grounds, holding that the issues before it had been fully litigated in the federal action. *Welch v. Philip Morris, Inc.*, N.Y.L.J., March 20, 1986, at 7, col. 1 (Sup.Ct.N.Y. County March 19, 1986).

ther sets forth the day-player rate to be paid to the actor for the reuse, *id.*, and provides that "[i]f the Producer is unable to find the player, it shall notify the Guild [SAG], and if the Guild is unable to find the player within a reasonable time, the Producer may use the photography ... without penalty ...," *id.* § 36(b).

Consistent with the requirements of section 36, Carson attempted to identify those actors and actresses who had performed in the commercials it intended to use. This search proved unsuccessful in a number of cases, including the identification of Welch in "Disadvantages" and "Tap Dancer." Carson then informed SAG of its inability to identify Welch and forwarded to SAG video copies of the commercials. Upon SAG's request, Carson provided SAG with letters from the producers of the original commercials, corroborating Carson's inability to identify the individual. Shortly thereafter, SAG informed Carson that it too was unable to identify Welch from the commercials. In accordance with section 36(b) of the Green Book, therefore, Carson included the two commercials in its November 7, 1982 program broadcast.

Welch, who had been in Europe at the time of the broadcast, learned of the commercials' use several days later. He contacted SAG which, in turn, notified Carson of Welch's identity and requested that Carson "process [its] usual payment" to Welch. On December 14, 1982, Carson forwarded to Welch a letter informing him that he had appeared on the program and requesting that he sign an attached consent form authorizing the use of the film and entitling him to the $596 minimum Green Book payment. Welch's business manager notified Carson by letter that its payment was inadequate and warned that Carson's use of the footage without Welch's express authorization subjected Carson to possible legal liability.

When no agreement was reached with Carson, Welch commenced this action against Carson for compensatory and puni-

tive damages, alleging that the use of the commercials without his written consent violated sections 50 and 51 of the New York Civil Rights Law, which proscribe the use of a person's "name, portrait or picture ... for advertising purposes or for the purpose of trade without the written consent" of the individual. N.Y.Civ.Rights Law § 51 (McKinney Supp.1986).[2] A jury trial was commenced on August 26, 1985. Upon conclusion of the proof, the district court granted Carson's motion for a directed verdict, Fed.R.Civ.P. 50(a), on the ground that Welch had consented to the reuse of the commercials through his membership in SAG and that Carson had fulfilled the requirements of that union's collective bargaining provisions governing reuse photography. In addition, the district court concluded that Welch's remedy, if any, was limited to the provisions of section 36(c) of the Green Book, which provides that where a single actor and a producer are unable to agree on compensation for the reuse of film, the "Producer may submit the matter to the Guild's [SAG's] Board of Directors for determination and both Producer and player shall be bound by the determination so made...." Green Book § 36(c).

On appeal, Welch contends that, despite the provisions of the Green Book, section 51 requires the express written authorization of the *individual*, which Carson never obtained. He further argues that the Green Book did not serve to grant Carson the necessary consent, since that agreement applies only when there is an express contract between the actor and the producer who wishes to reuse the film. Consequently, Welch asserts that the issue of consent should have been submitted to the jury.

## II. DISCUSSION

In determining whether the district court properly directed a verdict, we employ the same standard of review as applied by the district court in its initial review of Car-

**2.** Once notified of Welch's dissatisfaction with its use of the footage, Carson voluntarily re-

moved Welch's footage from the program prior to any rerun broadcasts.

son's motion. *C-Suzanne Beauty Salon, Ltd. v. General Insurance Company of America,* 574 F.2d 106, 112 n. 10 (2d Cir. 1978). That review requires affirmance of the verdict if "there is such an overwhelming amount of evidence in favor of the movant that [a] reasonable and fair minded [jury] could not arrive at a verdict against him." *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 168 (2d Cir.1980). Because we agree with the district court that a reasonable and fair minded jury could not have concluded that the collective bargaining agreement binding Welch did not supply the necessary consent to reuse the commercials, we affirm.[3]

When an individual joins a labor union, he agrees, as a matter of law, to abide by that union's constitution and by-laws "unless [the provisions] are contrary to good morals or public policy or otherwise illegal." *In re Willard Alexander, Inc.,* 31 N.Y.2d 270, 273, 338 N.Y.S.2d 609, 611, 290 N.E.2d 813, 814 (1972). Here, SAG's own membership application, which Welch signed when he joined the union in 1953, provides that the member will "abide and be bound by the ... by-laws, rules and regulations of [SAG], as the same now are or may hereafter be amended, enlarged or diminished." The SAG Constitution and By-Laws further provides that each member is "bound by the provisions of all collective bargaining contracts in effect between [SAG] and motion picture producers as the same are or may hereafter be amended." SAG Const. art. XIV, § 6. Accordingly, it is indisputable that Welch, having freely joined SAG, now is bound by the collective bargaining agreements which SAG negotiated on behalf of its members.

The Green Book is one such collective bargaining agreement. Among other things, section 36 of that agreement establishes a comprehensive procedure for the identification and compensation of players where producers wish to reuse old footage of such players in new ventures. *For the protection of SAG members,* section 36 requires a producer to make a good faith effort to identify a film's players prior to its reuse. Green Book § 36(a), (b). If the player is identified, the producer must negotiate with the player for the reuse of the film. *Id.* § 36(a). The player's footage then may be used only if an agreement is reached. *Id.* If, however, after a good faith effort the producer is unable to identify that player, he must inform SAG, which in turn conducts its own investigation. *Id.* § 36(b). If SAG's investigation also is unsuccessful in identifying the player, the producer may use the footage without penalty. *Id.* Testimony at trial by SAG's business agent, Kat Krone, conclusively established section 36's application to a situation like the one here, where a producer, not associated with the original filming of the commercial and with no contractual association with the players in that commercial, attempts to reuse the commercial in a different format.[4]

Here, Carson properly complied with section 36 by attempting to identify Welch and by contacting SAG when it was unable to do so. Only after SAG itself also was unable to identify Welch did Carson use the footage. Given Carson's strict adherence to the Green Book procedures and Welch's covenant as a member of SAG to abide by the agreement's provisions, it is clear that Welch must be viewed as having consented to the reuse of the commercials. As a

---

3. In light of this holding, we need not reach the district court's other basis for the directed verdict, namely, the remedies existing under § 36(c) of the Green Book.

4. Welch contends that the Green Book did not control this broadcast. Rather, he asserts, the broadcast came within the ambit of SAG's 1982 Commercials Contract ("Red Book"). Even if Welch is correct, which is unlikely in light of the testimony of SAG's business manager, it

makes little difference. Section 17B of the Red Book provides that "[i]f Producer is unable to find the principal performer within a reasonable time, it shall notify the Union, and if the Union is unable to find the principal performer within a reasonable time, Producer may reuse the photography or sound track without penalty." Red Book § 17B. Consequently, the same result would be reached regardless of which collective bargaining agreement governs.

member of SAG, Welch necessarily agreed to waive his statutory protection under section 51 in cases of reuse photography in exchange for the protection of section 36 of the Green Book. It is well settled under New York law that statutory benefits or protections otherwise available to individuals may be waived by union members under collective bargaining agreements where alternative protective measures, which do not conflict with the legislative purpose of the statute at issue, are agreed upon in negotiations. *American Broadcasting Companies, Inc. v. Roberts,* 61 N.Y.2d 244, 247, 473 N.Y.S.2d 370, 371, 461 N.E.2d 856, 857 (1984). The purpose behind section 51 simply is to prevent the commercial exploitation of an individual without his consent. *Rand v. Hearst Corporation,* 31 A.D.2d 406, 408, 298 N.Y.S.2d 405, 409 (1st Dep't 1969). The provisions of section 36 are entirely consistent with this underlying legislative intent, since the very purpose of the collective bargaining provision is to assure the player the opportunity to approve or disapprove the reuse and further to assure him appropriate compensation for such reuse.

### III. CONCLUSION

Having found that the collective bargaining agreement by which Welch was bound supplied the necessary consent for Carson's reuse of the footage, the district court correctly directed a verdict in Carson's favor. We carefully have reviewed all of Welch's other contentions and find them to be without merit. Accordingly, the judgment of the district court is affirmed.