Norby **WALTERS** and Lloyd Bloom, d/b/a World Sports and Entertainment, Inc., Plaintiffs,

v.

Brent **FULLWOOD** and George Kickliter, Defendants.

No. 87 Civ. 2624 (CLB).

United States District Court, S.D. New York.

Dec. 17, 1987.

Gold and Wachtel by Robert Gold, Elliot Silverman, and Anthony Pennachio, New York City, for plaintiffs.

Granik, Silverman, Sandberg, Campbell, Nowicki by Richard A. Glickel, New City, N.Y., for defendants.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

By motion fully submitted on October 5, 1987 in this diversity action, defendants Brent Fullwood and George Kickliter move (1) under 9 U.S.C. sec. 3, to stay, pending arbitration sought to be compelled by this Court pursuant to 9 U.S.C. sec. 4, the claims against Fullwood asserted by plaintiffs Norby Walters and Lloyd Bloom, doing business as World Sports and Entertainment, Inc. ("W.S. & E."); (2) under Rule 12(b)(2), F.R.Civ.P., to dismiss plaintiffs' action in whole or in part for lack of personal jurisdiction over the defendants; (3) under Rule 12(b)(3), F.R.Civ.P., to dismiss the action in whole or in part for improper venue or, alternatively, to transfer it to the Middle District of Alabama pursuant to 28 U.S.C. 1406(a); and (4) under Rule 12(b)(6), F.R.Civ.P., to dismiss plaintiffs' fourth claim for failure to state a claim upon which relief can be granted.

The following facts are uncontroverted.

Defendant Brent Fullwood, a Florida resident, was an outstanding running back with the University of Auburn football team in Alabama. His success in the highly competitive Southeastern Athletic Conference marked him as a top professional[*] prospect. At an unspecified time during his senior year at Auburn, Fullwood entered into an agreement with W.S. & E., a New York corporation ("the W.S. & E.

agreement"). The agreement was dated January 2, 1987, the day after the last game of Fullwood's college football career, and the first day he could sign such a contract without forfeiting his amateur status under sec. 3–1–(c) of the N.C.A.A. Constitution, quoted *infra.* The contract was arranged and signed for the corporation by plaintiff Bloom, and granted W.S. & E. the exclusive right to represent Fullwood as agent to negotiate with professional football teams after the spring draft of the National Football League ("N.F.L."). Walters and Bloom were the corporate officers and sole shareholders of W.S. & E. As a provisionally certified N.F.L. Players' Association ("N.F.L.P.A.") contract advisor, Bloom was subject to the regulations of that body governing agents ("N.F.L.P.A. Agents' Regulations"), which require the arbitration of most disputes between players and contract advisors.

On August 20, 1986, W.S. & E. paid $4,000 to Fullwood, who then executed a promissory note in plaintiffs' favor for that amount. The note was secured by a pledge of:

> "a security interest in all of the players rights to receive payments under any existing and or future contract or other agreement ("Player Contract") to which the Player may become a party relating to the Players services to or on behalf of any professional football team, if, as, and when such payments shall become due, including any insurance proceeds to which player may become entitled."

*August 20, 1986 promissory note,* exh. D to defendants' Notice of Motion. At various times throughout the 1986 season, plaintiffs sent to Fullwood or his family further payments that totaled $4,038.

Reviewing substantially similar facts involving these same plaintiffs and a different defendant in an unrelated case, Justice Altman of the New York State Supreme Court concluded,

> "The underlying facts of the case reveal a pernicious practice of encouraging young college athletes to enter into deceptive agreements which are postdated so they can continue to play college foot-

ball. The athletes thus act unethically and in violation of the rules of the National Collegiate Athletic Association[ ] and the National Football League[ ]."

*Walters v. Harmon,* 135 Misc.2d 905, 516 N.Y.S.2d 874 (Sup.Ct., N.Y.Cty.1987). While neither plaintiffs nor defendants have specifically admitted that the W.S. & E. agency agreement was post dated, they have conspicuously avoided identifying the actual date it was signed. There is a powerful inference that the agreement was actually signed before or during the college football season, perhaps contemporaneously with the August 20 promissory note, and unethically postdated as in other cases involving these plaintiffs. No argument or evidence has been presented to dispel this inference, and the Court believes the parties deliberately postdated the contract January 2. Even if this likelihood is not accepted, it is conceded by all parties and proven by documentary evidence that a security interest was granted on Fullwood's future earnings from professional football, by the express terms of the promissory note of August 20, 1986.

At some point prior to the N.F.L. spring 1987 draft, Fullwood repudiated his agreement with W.S. & E., and chose to be represented by defendant George Kickliter, an attorney in Auburn, Alabama. As anticipated, Fullwood was taken early in the N.F.L. draft. The Green Bay Packers selected him as the fourth player in the first round; he signed a contract with them, and currently is playing in his rookie season in the N.F.L.

In March, 1987, Walters and Bloom brought suit, since removed from New York State Supreme Court, alleging (1) that Fullwood breached the W.S. & E. agency agreement, (2) that Fullwood owed them $8,038 as repayment for the funds he received during the autumn of 1986, which are now characterized as loans, (3) that Kickliter tortiously induced Fullwood's breach of the 1986 agreement, and (4) that Fullwood and Kickliter tortiously interfered with plaintiffs' contractual relations with other players by breaching or induc-

ing the breach of the W.S. & E. agency agreement by Fullwood.

*Jurisdiction*

■ Walters and Bloom argue for the personal jurisdiction of this Court over Fullwood based on paragraph 10 of the W.S. & E. agency agreement, which reads, in relevant part:

This agreement shall be governed and construed according to the laws of the State of New York. The parties hereto consent to the jurisdiction of the courts of the State of New York, and of any federal court located in such state, in connection with any action, or proceeding, arising out of or relating to this agreement.

Defendant Fullwood concedes that this language creates jurisdiction by consent for the breach of contract claim, but argues that this Court lacks the power to consider plaintiffs' other claims against him. This Court concludes that the language of paragraph 10 also consents to jurisdiction over Fullwood for the second claim, since the alleged loans from W.S. & E. were made in connection with the W.S. & E. agency agreement, and for the fourth claim, which alleges damages flowing from the breach of that agreement. Since plaintiffs have jurisdiction by consent for all their claims against Fullwood, there is no need to consider their dubious argument for jurisdiction under the New York Civil Practice Laws and Rules ("C.P.L.R.") sec. 302(a)1, based on a contention that Fullwood transacted business in New York by telephoning his requests for money into this state.

Plaintiffs argue for jurisdiction over defendant Kickliter, an Alabama resident, under New York C.P.L.R. secs. 302(a)3(i) and 302(a)3(ii). These subdivisions of the so-called New York "long arm statute" provide for personal jurisdiction by a New York court over a non-domiciliary who:

"commits a tortious act without the state *causing injury to person or property within the state* ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services ren-

dered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce" (emphasis supplied).

This section has been held to include commercial torts. *Sybron v. Wetzel*, 46 N.Y.2d 197, 413 N.Y.S.2d 127, 385 N.E.2d 1055 (1978). Because the alleged injury to plaintiffs did not occur in New York State for the purposes of C.P.L.R. sec. 302(a)3, neither (i) nor (ii) of that section confers jurisdiction.

The New York Court of Appeals has held that jurisdiction under C.P.L.R. sec. 302(a)3 requires "a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there." *Fantis Foods, Inc. v. Standard Importing*, 49 N.Y.2d 317, 326, 425 N.Y.S. 2d 783, 787, 402 N.E.2d 122, 126 (1980) (suit by New York Corporation for conversion of feta cheese by a foreign corporation dismissed for lack of jurisdiction over defendants, when conversion took place in Greece and no other defendant contacts with New York were established). Thus, while a New York plaintiff suffers a kind of injury whenever it is the victim of a tort by a non-domiciliary, the statute "looks to the imparting of the original injury within the State of New York and not resultant damage, in order that jurisdiction may be effectuated." *American Eutectic Welding Alloy Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 434 (2d Cir.1971), *quoting, Black v. Oberle Rentals, Inc.*, 55 Misc.2d 398, 400, 285 N.Y.S.2d 226, 229 (Sup.Ct.Onondaga Cty.1967).

■ Plaintiffs assert that their injuries on the third and fourth claims occurred in New York because their offices are in New York City, and performance of the contract that Kickliter allegedly induced Fullwood to breach was anticipated there, through representation at the N.F.L. player draft. This Court rejects the contention that Fullwood's breach of contract thus occurred in New York so as to make Kickliter's induce-

ment of that breach in Alabama an out-of-state tort causing a New York injury. Presence at the N.F.L. draft is just one step in the substantial process of representing a college athlete seeking a professional football contract. Far more important representation occurs before the draft, in the form of promotional services increasing the likelihood that the client will be selected by a team on the client's "preferred list", and after the draft, in negotiating a favorable contract with the team that selects him. Where, as here, a player from an Alabama school signed an agreement in Alabama with a New York corporation, and an Alabama resident with no significant New York contacts thereafter allegedly induced him in Alabama to breach that contract, neither case law nor common sense supports a finding that injuries from the inducement of the contractual breach occurred in New York for the purposes of C.P.L.R. 302(a)3. *Cf. Fantis Foods, Inc., supra; Patrician Equity Corp. v. Meadows*, 86 Civ. 5045 (MJL) (S.D.N.Y.1987) [Available on WESTLAW, 1987 WL 4910] (not yet reported) (Loss of customers in New York as a result of alleged conversion of customer list in California by a California defendant not injury in New York for purposes of the statute); *Smith v. Morris & Manning*, 647 F.Supp. 101 (S.D.N.Y. 1987) (No New York injury creating "long-arm" jurisdiction over defendant Georgia law firm for out-of-state malpractice causing increased tax liability for plaintiff in New York).

This Court has personal jurisdiction over defendant Fullwood, but not over defendant Kickliter. The first and second claims, and that portion of the fourth claim directed to defendant Fullwood, therefore remain subject to our consideration; the third claim, and so much of the fourth as relates to defendant Kickliter, are dismissed without prejudice and without costs.

*Plaintiffs' claim for "interference with business relations"*

█ The fourth claim asserted by Walters and Bloom alleges that, by breaching or inducing the breach of the W.S. & E. agency agreement, Fullwood and Kickliter caused W.S. & E. to lose other clients, and damaged their business reputation. Defendants seek to dismiss this claim under Rule 12(b)(6), F.R.Civ.P., for failure to state a claim upon which relief can be granted. The Court grants the motion insofar as concerns Fullwood, with prejudice.

█ In order to state a claim for tortious interference with existing contractual relations, a plaintiff must allege (1) the existence of a valid contract between plaintiff and another contracting party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach of that contract by the other party; and (4) damages. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956). Plaintiffs have alleged neither Fullwood's knowledge of other contracts, nor his intentional procurement of any breach. Thus, no claim is stated.

█ If plaintiffs wish to have their complaint construed as alleging tortious interference with prospective economic advantage, they fare no better. Such a claim requires that "the defendant's sole motive was to inflict injury and that the defendant employed unlawful means to do so." *Nifty Foods Corp. v. Great Atlantic and Pacific Food Co., Inc.*, 614 F.2d 832 (2d Cir.1980), *citing Beardsley v. Kilmer*, 236 N.Y. 80, 140 N.E. 203 (1923); *see also, Felsen v. Sol Cafe Mgmt. Corp.*, 24 N.Y.2d 682, 301 N.Y. S.2d 610, 249 N.E.2d 459 (1969). No New York case law has been advanced to or discovered by this Court establishing that the breach of a contract, standing alone, is sufficient to create liability for subsequent breaches by others of other contracts. Indeed such a proposition is frivolous on its face, and we decline to be the first to so hold. Absent rational allegations that Fullwood breached the W.S. & E. agency agreement through wrongful means, specifically to damage plaintiffs' business relations with others, no claim is stated upon which relief can be granted.

*Treatment of defendants' motion to compel arbitration, and plaintiffs' surviving claims*

"We are living in a time when college athletics are honeycombed with falsehood, and when the professions of amateurism are usually hypocrisy. No college team ever meets another today with actual faith in the other's eligibility."

—President William Faunce of Brown University, in a speech before the National Education Association, 1904. *Quoted in* J. Betts, *America's Sporting Heritage 1850–1950*, 216 (1974).

The N.C.A.A. was organized in 1906 largely to combat such evils. Its constitution provides in relevant part that:

"Any individual who contracts or who has ever contracted orally or in writing to be represented by an agent in the marketing of the individual's athletic ability or reputation in a sport no longer shall be eligible for intercollegiate athletics in that sport."

N.C.A.A. Constitution, sec. 3-1-(c). Section 3-1-(a) prohibits any player from accepting pay in any form for participation in his college sport, with an exception for a player seeking, directly without the assistance of a third party, a loan from an accredited commercial lending institution against future earnings potential solely in order to purchase insurance against disabling injury.

■ This Court concludes that the August 1986 loan security agreement and the W.S. & E. agency agreement between Fullwood and the plaintiffs violated sections 3-1-(a) and 3-1-(c) of the N.C.A.A. Constitution, the observance of which is in the public interest of the citizens of New York State, and that the parties to those agreements knowingly betrayed an important, if

perhaps naive, public trust. Viewing the parties as *in pari delicto*, we decline to serve as "paymaster of the wages of crime, or referee between thieves". *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (1948), *quoting Schermerhorn v. Talman*, 14 N.Y. 93, 141 (1856). *See also, In re Shopping Carts Antitrust Litigation*, 1984–1 Trade Cas. (CCH) ¶ 65,823 (Nov. 18, 1983) [Available on WESTLAW, 1983 WL 1950]; *Cf. Islamic Republic of Iran v. Pahlavi*, 94 A.D.2d 374, 382, 464 N.Y.S.2d 487, 498 (1st Dept.1983), *aff'd* 62 N.Y.2d 474, 478 N.Y.S.2d 597, 467 N.E.2d 245 (1984), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985) (Kupferman, J., concurring) (a "court should not lend its aid to a corrupt or evil design"). We consider both defendant Fullwood's arbitration rights under the N.F.L.P.A. Agents' Regulations, and plaintiffs' rights on their contract and promissory note with Fullwood, unenforceable as contrary to the public policy of New York. "The law 'will not extend its aid to either of the parties' or 'listen to their complaints against each other, but will leave them where their own acts have placed them.'" *Stone, supra*, 298 N.Y.2d at 271, 82 N.E.2d 571, *quoting, Schermerhorn, supra*, 14 N.Y. at 141.

Absent these overriding policy concerns, the parties would be subject to the arbitration provisions set forth in section seven of the N.F.L.P.A. Agents' Regulations[1], and plaintiffs' rights under the contract and promissory note with Fullwood also would be arbitrable. *See, Wood v. Nat'l Basketball Ass'n*, 602 F.Supp 525, 529 (S.D.N.Y. 1984), *aff'd*, 809 F.2d 954 (2d Cir.1987); *Crawford v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 35 N.Y.2d 291, 361 N.Y.S.2d 140, 319 N.E.2d 408 (1974); *Willard Alexander, Inc. v. Glasser*, 31 N.Y.2d 270, 338

---

1. While defendants have sought to stay plaintiffs' action and compel arbitration of all claims under the Federal Arbitration Act ("F.A.A."), 9 U.S.C. secs. 3 and 4, both sides appear to have assumed that the arbitration agreement's effectiveness would be analyzed under the N.Y. C.P. L.R. 7501. There is authority suggesting that a federal district court sitting on a diversity matter should apply the F.A.A. as federal substantive law. *See, e.g., Management Recruiters of*

*Albany, Inc. v. Management Recruiters Int'l. Inc.*, 643 F.Supp. 750, 752–53 (N.D.N.Y.1986); *Sharp Electronics Corp. v. Branded Prod. Inc.*, 604 F.Supp. 239, 242–43 (S.D.N.Y.1984); *Klein Sleep Products, Inc. v. Hillside Bedding Co.*, 563 F.Supp. 904 (S.D.N.Y.1982). The Court's refusal to order arbitration, for the reasons stated in the text, renders consideration of this issue unnecessary.

N.Y.S.2d 609, 290 N.E.2d 813 (1972), *cert. denied sub. nom. Glasser v. Willard Alexander, Inc.*, 410 U.S. 983, 93 S.Ct. 1505, 36 L.Ed.2d 179 (1973); *Merrill Lynch v. Griesenbeck*, 28 A.D.2d 99, 281 N.Y.S.2d 580 (1st Dept.), *aff'd.* 21 N.Y.2d 688, 287 N.Y.S.2d 419, 234 N.E.2d 456 (1967); *Walters v. Harmon*, 135 Misc.2d 905, 516 N.Y. S.2d 874 (Sup.Ct., N.Y.Cty.1987). *Cf. Welch v. Carson Production Group, Ltd.*, 791 F.2d 13 (2d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 647, 93 L.Ed.2d 703 (1986). However, under the "public policy" exception to the duty to enforce otherwise-valid agreements, we should and do leave the parties where we find them.

■ It is well settled that a court should not enforce rights that arise under an illegal contract. *Stone v. Freeman, supra,* 298 N.Y. 268, 82 N.E.2d 571 (1948); *Flegenheimer v. Brogan*, 284 N.Y. 268, 30 N.E.2d 591 (1940); *accord, Rutkin v. Reinfeld,* 229 F.2d 248 (2d Cir.1956); *Anabas Export, Ltd. v. Alper Indus., Inc.*, 603 F.Supp. 1275 (S.D.N.Y.1985).

In *Flegenheimer, supra,* the widow and personal representative of the infamous gangster and bootlegger Arthur Flegenheimer (better known as Dutch Schultz) sought a money judgment, alleging that the defendant had acquired wrongfully the controlling stock interest in the Yonkers Brewery. Schultz had transferred the brewery stock to a straw man as part of a fraudulent scheme to evade federal and state liquor license regulations, which prevented a former bootlegger from dealing in beer. Defendant purchased the stock with knowledge from the nominee holder, after Schultz' death. The New York Court of Appeals concluded, "[w]e think those transactions [avoiding statutory restrictions] were so far against the public good as to disable the plaintiff from invoking the aid of the court in her endeavor to disengage herself (as administratrix) from the unlawfulness of the conduct of her intestate." *Flegenheimer, supra,* 284 N.Y. at 273, 30 N.E.2d 591.

This principle was reinforced by *Stone v. Freeman, supra,* in which the New York Court of Appeals refused to allow a clothing broker to recover payments that had been made to a vendor on the understanding, thereafter breached, that the vendor would pass them on as kickbacks, or bribes, to representatives of a customer, the French Purchasing Mission.

■ An agreement may be unenforceable in New York as contrary to public policy even in the absence of a direct violation of a criminal statute, if the sovereign has expressed a concern for the values underlying the policy implicated. In *In re Estate of Walker*, 64 N.Y.2d 354, 359, 486 N.Y.S.2d 899, 902, 476 N.E.2d 298, 301 (1985), the Court of Appeals refused to enforce a bequest of adoption decrees to the testator's adopted daughters, concluding that such a bequest, though not criminal, was contrary to public policy. The court concluded, " '[W]hen we speak of the public policy of the state, we mean the law of the state, whether found in the Constitution, the statutes or judicial records'. Those sources express the public will and give definition to the term. A legacy is contrary to public policy, not only if it directly violates a statutory prohibition ... but also if it is contrary to the social judgment on the subject implemented by the statute." *Walker, supra,* 64 N.Y.2d at 359, 486 N.Y.S.2d at 902, 476 N.E.2d 298 (cites omitted). *See also, W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *and Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

Even in the context of a non-criminal contract, "a prime and long-settled public policy closes the doors of our courts to those who sue to collect the rewards of corruption." *McConnell v. Commonwealth Pictures, Corp.*, 7 N.Y.2d 465, 469, 199 N.Y.S.2d 483, 485, 166 N.E.2d 494, 496 (1960). As Professor Walter Gellhorn wrote more than half a century ago, "where legislative materials are used as sources of information and as analogies, there need be no direct connection in terms between statutes and the contract under judicial consideration." Gellhorn, *Contracts and Public Policy*, 35 Colum.L.Rev.

679, 692 (1935). *See also, Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir.1982) ("courts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society").

■ The principles requiring non-enforcement of contracts on public policy grounds apply equally to arbitration agreements. *See, e.g., Durst v. Abrash*, 22 A.D. 2d 39, 253 N.Y.S.2d 351 (1st Dept.1964), *aff'd*, 17 N.Y.2d 445, 266 N.Y.S.2d 806, 213 N.E.2d 887 (1965) (declining to compel arbitration of a claim arising under a usurious agreement); *see also*, Sterk, *Enforceability of Agreements to Arbitrate: An Examination of the Public Policy Defense*, 2 Cardozo L.Rev. 481, 483 (1981) ("Public policy should be invoked to prevent arbitration when at issue is a legislative expression or a basic case law principle designed for some purpose other than to foster justice between the parties to the dispute.")

The New York State legislature has spoken on the public policies involved in this case, by expressing a concern for the integrity of sporting events in general, and a particular concern for the status of amateur athletics. *See, e.g.*, New York *Tax Law* sec. 1116(a)(4) (McKinney's supp. 1987) (granting tax exemption to any organization "organized and operating exclusively ... to foster national or international amateur sports competition); New York *Penal Law* secs. 180.35, 180.40 (McKinney's supp. 1987) (establishing criminal sanctions for sports bribery).

■ Even were we not convinced of the legislative concern for the values underlying sec. 3–1–(c) of the N.C.A.A. Constitution, New York case law prevents judicial enforcement of contracts the performance of which would provoke conduct established as wrongful by independent commitments undertaken by either party. In *Reiner v. North American Newspaper Alliance*, 259 N.Y. 250, 181 N.E. 561 (1932), a passenger on the transatlantic dirigible *Graf Zeppelin* agreed, in violation of his contract of carriage, to send messages from that airship to persons in the United States. When the passenger sought to assert his right to payment, the New York Court of Appeals found the contract unenforceable as a matter of public policy. Not all contracts inducing breaches of other agreements fall within this rule, but those requiring fraudulent conduct are unenforceable as contrary to the public policy of New York. Particularly appropriate is the following language from the concurrence of Judge Crane in *Reiner:*

> "While the law does not approve the defendant's conduct yet, being called upon to choose between two evils, it prefers to permit the defendant to retain the benefits of such an unlawful contract than to aid a plaintiff in enforcing it. As stated by Lord Mansfield in the case of *Holman v. Johnson* (1 Cowp. 341, 343): 'The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy [....] No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. [...] So if the plaintiff and defendant were to change sides, and the defendant was to bring this action against the plaintiff, the latter would then have the advantage of it.'"

*Reiner, supra*, 259 N.Y. at 260, 181 N.E. 561. *See also, Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 86 (2d Cir.1982) ("As a matter of public policy, fraud and deception practiced on a third party ... will invalidate a New York contract, at least where there is a 'direct connection between the illegal transaction ... and the obligation sued upon'") (Oakes, C.J. concurring and dissenting), *quoting, McConnell, supra*, 7 N.Y. at 471, 199 N.Y.S.2d at 487, 166 N.E.2d 497; *and Bankers Trust Co. v. Litton Systems*, 599 F.2d 488, 492 (2d Cir.1979) (in action under the New York Uniform Commercial Code by a holder in due course of a negotiable instrument induced by bribery, "the court's concern is not with the position of the defendant; instead, the question is whether

the plaintiff should be denied recovery for the sake of public interests").

In the case before us, no party retains enforceable rights. To the extent plaintiffs seek to recover on the contract or promissory note signed by Fullwood, their wrongful conduct prevents recovery [2]; to the extent Fullwood seeks to compel arbitration, as provided for in the N.F.L.P.A. Agents' Regulations, his own wrongs preclude resort to this Court.

All parties to this action should recognize that they are the beneficiaries of a system built on the trust of millions of people who, with stubborn innocence, adhere to the Olympic ideal, viewing amateur sports as a commitment to competition for its own sake. Historically, amateur athletes have been perceived as pursuing excellence and perfection of their sport as a form of self-realization, indeed, originally, as a form of religious worship, with the ancient games presented as offerings to the gods. See R.J. Hopper, *The Early Greeks* 214. In modern English, "Corinthian" is defined as "a gentleman amateur in sports". *Webster's Deluxe Unabridged Dictionary* 406 (2d ed. 1979). By demanding the most from themselves, athletes were believed to approach the divine essence. C. Boara, *Classical Greece* 23. Through athletic success, the Greeks believed man could experience a kind of immortality [3].

There also is a modern, secular purpose served by secs. 3–1–(a) and 3–1–(c) of the N.C.A.A. Constitution. Since the advent of intercollegiate sports in the late 19th century, American colleges have struggled, with varying degrees of vigor, to protect the integrity of higher education from sports-related evils such as gambling, recruitment violations, and the employment of mercenaries whose presence in college athletic programs will tend to preclude the participation of legitimate scholar-athletes.

Sections 3–1–(a) and 3–1–(c) of the N.C.A.A. Constitution were instituted to prevent college athletes from signing professional contracts while they are still playing for their schools. The provisions are rationally related to the commendable objective of protecting the academic integrity of N.C.A.A. member institutions. A college student already receiving payments from his agent, or with a large professional contract signed and ready to take effect upon his graduation, might well be less inclined to observe his academic obligations than a student, athlete or not, with uncertainties about his future career. Indeed, he might not play at his college sport with the same vigor and devotion.

The agreement reached by the parties here, whether or not unusual, represented not only a betrayal of the high ideals that sustain amateur athletic competition as a part of our national educational commitment; it also constituted a calculated fraud on the entire spectator public. Every honest amateur player who took the field with or against Fullwood during the 1986 college football season was cheated by being thrown in with a player who had lost his amateur standing.

In August 1986, Brent Fullwood was one of that select group of college athletes virtually assured of a lucrative professional sports contract immediately upon graduation, absent serious injury during his senior year. The fruits of the system by which amateur players become highly paid professionals, whatever its flaws, were soon to be his. That is precisely why plaintiffs sought him out. Both sides of the transaction knew exactly what they were doing, and they knew it was fraudulent and wrong. This Court and the public need not

---

**2.** We note in passing that, as a provisionally certified N.F.L.P.A. agent, Bloom was bound by sec. 5(C)(1) of the N.F.L.P.A. Agents' Regulations, which forbids a contract advisor from "[p]roviding or offering to provide anything of significant value to a player in order to become the contract advisor for such player".

**3.** As expressed by the classical poet Pindar of Thebes (518–438 B.C.):

"Creatures of a day/ What is someone?/ What is no one?/ Man is merely a shadow's dream/ But when god-given glory comes upon him in victory/ A bright light shines on us and life is sweet/ when the end comes the loss of flame brings darkness/ But his glory is bright forever." C. Boara, *Classical Greece, supra,* at 23.

suffer such wilful conduct to taint a college amateur sports program.

*Conclusion*

Plaintiffs' claims against defendant Kickliter are dismissed under Rule 12(b)(2), F.R. Civ.P., for lack of personal jurisdiction over that defendant. Plaintiffs' fourth claim is dismissed against defendant Fullwood under Rule 12(b)(6), F.R.Civ.P. for failure to state a claim on which relief can be granted. The first and second claims against Fullwood are dismissed with prejudice, and Fullwood's requests to stay this action and compel arbitration are denied, as the underlying agreements violate the public policy of New York, and the parties are *in pari delicto*. The Clerk shall enter final judgment.

SO ORDERED.