**William PERRY, as President of Local 6, International Longshoremen's Association, A.F.L.–C.I.O., An Unincorporated Association, et al., Plaintiffs,**

v.

**INTERNATIONAL TRANSPORT WORKERS' FEDERATION, et al., Defendants.**

**No. 83 Civ. 2059 (CES).**

United States District Court, S.D. New York.

Sept. 12, 1990.

1190

Laufer & Farkash, by Jacob Laufer, New York City, for Perry.

Poles, Tublin, Patestides & Stratakis, by William J. Brady, III, New York City, for Int'l Shipping.

Phillips Cappiello Kalban, Hofmann & Katz, P.C., by Ned R. Phillips, New York City, for defendants.

## MEMORANDUM DECISION

STEWART, District Judge:

This is an action brought by plaintiff William Perry ("Perry"), as President of Local 6 of the International Longshoremen's Association, AFL–CIO, an unincorporated association ("Local 6")[1] and intervenor plaintiff International Shipping Association ("ISA")[2] against the defendant International Transport Workers' Federation ("ITF").[3] Both plaintiffs allege violation of the Clayton Act, 15 U.S.C. § 15 (hereinafter "Clayton Act"), by a group boycott and unlawful combination, resulting in restraint of trade in violation of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1 and 2 (hereinafter "Sherman Act" or "Section 1" or "Section 2").

Both plaintiffs also allege a state law claim for intentional interference with contractual rights. In addition Local 6 alleges tortious interference with prospective contractual relations.[4]

Defendant ITF cross-claims, also alleging antitrust violations and tortious interference with contractual rights as well as unfair competition and a trademark violation under Section 43(a) of the Lanham Act (hereinafter "Section 43(a)" or "Section 1125(a)"). 15 U.S.C. § 1125(a).

Plaintiffs now move for partial summary judgment pursuant to Rule 56 of Fed.R. Civ.P. on the issue of liability on their claim of tortious interference with an existing contract and partial summary judgment dismissing defendant's requests for monetary damages in its counter claims against both plaintiffs. Local 6 also seeks partial summary judgment on its claim of tortious interference with prospective contractual relations.

Defendant International Transport Workers' Federation (the "ITF") cross moves for summary judgment under Fed. R.Civ.P. 56 as to all counts of the complaint of both plaintiffs.

For the reasons that follow, we grant summary judgment to defendant on the plaintiffs' antitrust claim and dismiss defendant's antitrust claim. We grant summary judgment to plaintiffs on defendant's counterclaim which alleges tortious interference with contract and pecuniary interest. We deny summary judgment with respect to all other claims.

## FACTUAL BACKGROUND

This case concerns a dispute between plaintiff Local 6 and the ITF over the rep-

---

1. Plaintiff informed this court in its Memorandum of Law in Support of Motion for Summary Judgment dated May 30, 1989 that the name of Local 6 has been changed to District 6, "IUISTHE." Plaintiff will move to amend the caption of this action.

2. ISA is an association which represents the interests of shipowners. Based in Monaco, it has negotiated labor contracts with Local 6 through its agent, Venturas Ship Chartering Ltd., which has offices in New York. We permitted ISA to intervene as a plaintiff.

3. ITF is a federation of transportation-related unions from around the world and is headquartered in London, England.

4. Pursuant to a stipulation dated May 25, 1989, plaintiffs stipulated to a dismissal with prejudice of their second cause of action alleging unfair labor practices under 29 U.S.C. Section 158(b)(4) and Section 303(b) of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 187(b).

resentation of crews on "flag of convenience" vessels. The term "flag of convenience" denotes a cost-cutting business practice used by shipowners. A flag of convenience ("FOC") vessel is effectively owned by interests in one nation but is registered in another. Its owners can then avoid the first nation's higher taxes and more stringent labor laws. Under international maritime law, registry not ownership determines the country to which a ship belongs.

Since the late 1940s ITF has attempted to become the worldwide representative for FOC crews, directing its affiliate unions to negotiate agreements with FOC vessel owners. In a number of ports around the world, ITF employs "inspectors" who board FOC vessels to check for a "blue certificate" which is given to ships whose owners sign ITF agreements. If a vessel does not carry a blue certificate, the inspector tries to persuade the captain to sign an ITF agreement. If the captain refuses, the inspector informs the captain that portside unions (usually ITF affiliates) will boycott or "black" the vessel until an ITF agreement is signed. For example, "blacking" could entail a refusal to handle the ship in any way, such as a refusal to supply tugboats or pilotage services or refusal by the dockers to load or unload the ship. *See* May 30, 1989 Defendant's Memorandum in Support of Motion for Summary Judgment, page 3 ("Deft's Memo for Summary Judgment").

Local 6 was initially chartered by the International Federation of Health Professionals and has primarily represented factory, health and restaurant workers located in the tri-state area (New York, New Jersey, Connecticut). *See* Deposition of William Perry, April 18, 1989, pp. 10–11. In 1972 Local 6 became affiliated with the International Longshoremen's Association ("ILA"). *Id.* at 13. That affiliation continued until 1984. *Id.*

In 1982 Local 6 began a drive to organize FOC seamen. During 1980–84 ISA's primary function was to negotiate collective bargaining agreements between labor unions and shipowners. *See* May 30, 1989

Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pltf's Memo for Summary Judgment"), at 2. ISA acted through its New York agent, Venturas Ship Chartering, Ltd., represented by Evangelos Venturas.

In 1982 Perry and Venturas (on behalf of ISA's member shipowners) executed agreements with four shipowners. Among these four was an agreement with the owners of the ship Ocean Sky, signed on November 24, 1982.

On February 4, 1983, the Ocean Sky arrived in the port of Haifa, Israel to discharge cargo. During its stay in Haifa, an ITF inspector named Captain Groman ("Groman") boarded the Ocean Sky and sought to organize the crew by obtaining execution of the standard ITF collective bargaining agreement. When the vessel's owners refused to deal with ITF, citing their contract with Local 6, an Israeli pilots' union affiliated with ITF declined to furnish a pilot for the Ocean Sky's departure from Haifa, thereby effectively detaining the ship there. Plaintiff alleges that as of February 25, 1983, ITF was aware of and had approved the blacking of the Ocean Sky. *See* May 30, 1989 Plaintiff's Notice of Motion, ¶ 42.

Local 6 commenced this action in March 1983, by an order to show cause seeking a temporary restraining order directing ITF to release the Ocean Sky from detention in Haifa. This court issued the TRO on March 18, 1983, but by March 22 or March 23, 1983 the Ocean Sky had managed to leave Haifa without a pilot under cover of night.

In a Memorandum Decision dated November 7, 1986 this court denied plaintiff's motion for a preliminary injunction prohibiting ITF from engaging in an alleged worldwide boycott of FOC vessels operating under Local 6 labor contracts. We also found that we had in personam jurisdiction over defendants International Transport Workers' Federation, William Lindner, John Law and the Transport Workers' Union of America. *See William Perry v. International Transport Workers' Feder-*

*ation,* No. 83 Civ. 2059 (S.D.N.Y. Nov. 7, 1986).

## DISCUSSION

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted if a review of the materials before the court shows that no genuine issue of material fact remains for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A summary judgment may be rendered on the issue of liability alone even though there is a genuine issue as to the amount of damages. *Id.* All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party. *See David Thompson v. Davor Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984). The movant has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances.

■ In antitrust cases, summary judgment should be granted sparingly, "especially where an allegation of conspiracy raises issues of fact as to motive and intent." *See Burlington Coat Factory Warehouse v. Belk Bros.,* 621 F.Supp. 224, 231 (S.D.N.Y.1985). Summary judgment is also inappropriate where the resisting party "comes forth with affidavits or other material ... that generates uncertainty as to the true state of any material fact ..." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Nevertheless, summary judgment is appro-

priate in some antitrust cases. *See, e.g., First National Bank v. Cities Service Co.,* 391 U.S. 253, 274–88, 88 S.Ct. 1575, 1585–92, 20 L.Ed.2d 569 (1968). Where plaintiff fails to present significant probative evidence to demonstrate that a genuine issue of material fact exists, summary judgment is appropriate. *See Western Systems, Inc. v. Dynatech Corp.,* 610 F.Supp. 585, 588 (D.Colo.1985).

### 1. *The Anti–Trust Claims*

Plaintiffs allege that ITF violated Sections 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1–2,[5] in that the steps taken by ITF and its affiliates to enforce the ITF's "blacking" policy constitute an unlawful group boycott, combination and conspiracy in restraint of interstate and international trade. Second Amended Complaint at ¶ 22. Further, plaintiffs allege that the ITF and its co-conspirators try to force FOC vessels and/or their owners to sign an ITF agreement and make payments to the ITF welfare fund. *Id.* at ¶ 17.

Defendant ITF argues that plaintiffs' antitrust claim should be dismissed because the activities which plaintiffs contend violate the antitrust laws come within a statutory exemption accorded to labor activity. *See* Deft's Memo for Summary Judgment at 1. We agree.

■ The Sherman Act, which prohibits concerted action in restraint of "trade or commerce among the several states or with foreign nations ...," was enacted primarily "to protect consumers from monopoly prices, and not to serve as a comprehensive code to regulate and police all kinds and types of interruptions and obstructions to the flow of trade." *Allen Bradley Co. v. Local Union No. 3,* 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945). The Second Circuit has explicitly adopted this interpretation, stating that the antitrust

5. 15 U.S.C. § 1 provides in relevant part:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....
15 U.S.C. § 2 provides in relevant part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor ...

laws "were designed principally to outlaw restraints upon commercial competition in the marketing and pricing of goods and services and were not intended as instruments for the regulation of labor-management relations." *Kennedy v. Long Island Railroad Co.*, 319 F.2d 366, 372 (2d Cir. 1963).

To assure that the Sherman Act was applied in accordance with its original purpose, Congress enacted the Clayton Act, which, in relevant part, states "[t]he labor of a human being is not a commodity or article of commerce. [T]he antitrust laws shall [not] be construed ... to forbid or restrain individual members of such [labor] organizations from lawfully carrying out the legitimate objects thereof." 15 U.S.C. § 17. Thus, two declared congressional policies must be reconciled, one seeking to preserve a competitive business economy, and the other preserving the rights of labor to organize to better its conditions through the agency of collective bargaining. *Allen Bradley*, 325 U.S. at 806, 65 S.Ct. at 1538.

Further, the Norris–LaGuardia Act, ("Norris–LaGuardia" or the "Act") was passed to restrict the application of the Sherman Act to labor disputes and to reduce the power of the federal courts to intervene in such disputes. *See Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541, 546 (9th Cir.1974). The Act stripped the federal courts of jurisdiction "to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute." 29 U.S.C. § 101. Section 13 of the Act defines a labor dispute as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113.

■ The parties agree that to invoke the statutory labor exemption, three conditions must be met: 1) the party seeking exemption must be a labor group; 2) the labor group must not have acted in concert with a nonlabor group; and 3) the activity must have occurred in the context of a labor dispute. *See United States v. Hutcheson*, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941).

Plaintiffs do not dispute defendant's contention that federal labor law governing the applicability of anti-trust law to labor disputes applies in this case. Nor do plaintiffs dispute that ITF is a labor group. However, plaintiffs deny that defendant satisfies the other two requirements for the labor exemption, and allege that 1) there was no labor dispute in Haifa and 2) ITF acted in concert with non-labor entities in effecting its boycott. *See* July 11, 1989 Plaintiffs' Memorandum of Law in Reply to Defendant's Motion for Summary Judgment ("Pltfs' Reply Memo") at 2.

### Labor Dispute

Plaintiffs argue that the occurrence of violence in a dispute deprives it of status as a "labor dispute" and thus precludes eligibility for the labor exemption from anti-trust laws. Specifically, plaintiffs allege that a statement made by Captain Groman, ITF's local inspector in Haifa, in a telex to the owners of the Ocean Sky was a threat of violence warning that they should sign an ITF Special Agreement "in order to avoid damages to the vessel." In addition, plaintiffs contend defendant's actions were "violent" when ITF representatives boarded the Ocean Sky and moved the vessel to another berth in the port, over the objections of its crew. Finally, the ship had to resort to leaving the port without the assistance of pilotage services which it was required to have to leave the port. These actions, plaintiffs contend, take the dispute out of the confines of a labor dispute and deprive it of the labor activity exemption. Pltfs' Reply Memo at 4. We disagree.

Defendant correctly points out that plaintiffs rely on cases which decided only whether a federal court had jurisdiction to issue an injunction against unlawful activity. Even though a court issues an injunction prohibiting violent or unlawful activity, such an action does not necessarily

change the nature of the dispute as a labor dispute. Plaintiff relies heavily on *Scott v. Moore*, 680 F.2d 979 (5th Cir.1982), *rev'd on other grounds*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), a case involving an attack by a group of people on a construction site where nonunion labor was being used. In that case the Fifth Circuit Court of Appeals upheld the issuance of an injunction enjoining the violent conduct, and found that there was not a labor dispute within the meaning of the Norris–LaGuardia Act. *Scott*, 680 F.2d at 986 n. 3.

In our view plaintiffs misconstrue *Scott*. The *Scott* holding was based on the Fifth Circuit's ruling that the attack in that incident did not grow out of any legitimate union activity. *Id.* at 1000. The court noted there was no collective bargaining agreement, no effort to seek recognition, no solicitation, no informational picketing, nor any other organizational efforts to achieve representation of the nonunion workers. The employer-employee relationship was not the matrix of the controversy. *Id; see also Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association*, 457 U.S. 702, 713 n. 12, 102 S.Ct. 2672, 2680 n. 12, 73 L.Ed.2d 327 (1982) (test for determining a labor dispute is whether the employer-employee relationship is the "matrix of the controversy.") Indeed, in *Scott* the Fifth Circuit stated specifically that "a labor dispute does exist where unlawful conduct occurs in conjunction with some legitimate labor activity." *Scott*, 680 F.2d at 1001.

■ In our case there was legitimate labor activity in that Inspector Groman was attempting to protect the interests of the ITF by trying to find out whether the Ocean Sky was covered by an ITF-approved agreement and thus eligible for full service and cooperation from Israeli and ITF-affiliated union members in Haifa. Therefore, it is our view that even if the activities in the instant case are characterized as "violent," the presence of violence alone is not enough to deprive defendant of the labor exemption to anti-trust liability. The cases suggest that the presence of violence does not necessarily allow an anti-

trust claim, but rather only allows courts to issue injunctions or to take other action to control the violence.

In the instant case the parties do not dispute that the goal of the ITF activities prompting this lawsuit was the signing of a collective bargaining agreement with the owners of the Ocean Sky, as well as with other FOC shipowners. Nor is there any dispute that the alleged "violence" occurred in the context of ITF's organizing activity. Therefore, we conclude that this was a legitimate labor activity aimed at the employer-employee relationship, and thus a labor dispute.

### Non–Labor Entities

■ Plaintiffs' other argument for denying the labor exemption is that ITF's "blacking" of the Ocean Sky was accomplished in concert with non-labor groups, namely, Histadrut, an Israeli organization, and the shipowners with whom the ITF or its affiliates had a collective bargaining agreement. Pltfs' Reply Memo at 15.

### A. Histadrut

Plaintiffs assert that Histadrut is an Israeli labor organization which is also an employer owning a conglomerate of industries "responsible for 20–25% of the gross national product of Israel." *Id.* They allege that defendant's cooperation with Histadrut in refusing to provide pilotage services for the Ocean Sky to leave the port of Haifa "may" constitute a combination with a non-labor entity within the meaning of the Norris–LaGuardia Act. *Id.* Plaintiffs assert that even the "mere possibility of the existence of such a combination" along with defendant's alleged "demonstrated tenor" of an intent to drive Mr. Perry out of the FOC business is enough to defeat a motion for summary judgment on the anti-trust claims. *Id.* We disagree.

As mentioned above, the Supreme Court held in *Hutcheson* that the statutory exemption of the Clayton Act applies when the union has acted in its self-interest and apart from any non-labor group. *Hutche-*

*son,* 312 U.S. at 231, 61 S.Ct. at 466.[6] As we already noted above plaintiffs do not dispute that ITF was acting in its self-interest when it was carrying out its efforts to represent the crew of the Ocean Sky. Plaintiffs allege only that defendant combined with a non-labor group to achieve its goal. However, plaintiffs do not explain how Histadrut's activities as an employer created an anticompetitive conspiracy against the FOC shipowners or Local 6.

Plaintiffs have submitted no factual evidence to support their conclusory allegations concerning Histadrut's status as a non-labor entity. In fact in their complaint and in their briefs plaintiffs themselves identify Histadrut as an "Israeli *labor* organization." Second Amended Complaint, ¶ 13 (emphasis added).

Plaintiffs' naked assertion that Histadrut is a non-labor entity owning a conglomerate of industries is insufficient to withstand a summary judgment motion. Summary judgment is appropriate in anti-trust cases in which the plaintiff can offer only vague and conclusory charges. *See Rodrigue v. Chrysler Corp.,* 421 F.Supp. 903, 906 (E.D. La.1976); *Murdock v. City of Jacksonville,* 361 F.Supp. 1083, 1086–87 (M.D.Fla.1973) ("Even in an antitrust case a party cannot rest on the allegations contained in his complaint but must, in opposition to a motion for summary judgment, come forward with affidavits setting forth specific facts showing that there is a genuine issue of material fact for trial.")

■ Even if a union's actions are intended to put a company out of business the union's actions may be exempt from anti-trust liability. In *Hunt v. Crumboch,* 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945) the union refused to admit a company's employees to membership and to sell its members' services to the company. The Court held that the statutory exemption recognized in *Hutcheson* accorded employees "an absolute right ... to work or cease working according to their own judgments"

as long as the "only combination ... [is] one of workers alone." *Id.* 325 U.S. at 824, 65 S.Ct. at 1547. It is undisputed that the incident in Haifa consisted at least in part of a concerted refusal by Israeli labor unions affiliated with ITF to provide services to FOC ships without ITF agreements. There is no allegation that the crew of the Ocean Sky was coerced or even persuaded to participate in a work stoppage. The inability of the Ocean Sky to unload its cargo was due solely to the refusal to work by the Israel union members. The fact that the refusal to work included members of Histadrut is not enough to implicate anti-trust liability. Even if we accept plaintiffs' unsupported allegations that Histradrut was a non-labor entity, Histadrut's interests as an employer would also have to be benefited to bring about anti-trust liability, as the following discussion shows.

**B. Shipowners**

■ Plaintiffs alternatively argue that defendants combined with non-labor entities because the ITF agreements with other FOC owners constituted a combination with a non-labor entity. Pltfs' Reply Memo at 15. Plaintiffs' theory is that an owner who did not sign an ITF agreement could not compete with those who did sign the agreement because they could not trade in those ports which were ITF "territory." *Id.* at 16. We disagree. Based on the cases we discuss below, we conclude that this combination in the form of collective bargaining agreements with shipowners alone is not sufficient to deprive a labor union of the labor exemption.

In *Allen Bradley, supra,* the Court assumed that no antitrust liability would attach to a union's agreements if made individually with contractors in a collective bargaining relationship. *Allen Bradley,* 325 U.S. at 809, 65 S.Ct. at 1539. The Court elaborated further on this issue in *Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct.

---

**6.** *Hutcheson* construed the Sherman Act, the Clayton Act, and the Norris–LaGuardia Act together to immunize from antitrust liability one union's picketing an employer as part of a dispute over which of two unions was entitled to certain jobs. *Hutcheson,* 312 U.S. at 232, 61 S.Ct. at 466.

1596, 14 L.Ed.2d 640 (1965), finding that a union-employer agreement was within the labor exemption.[7] The Court reasoned that such agreements are exempt if the subject of a restriction is intimately related to wages, hours and working conditions. So long as a union's successful attempt to obtain that provision is through bona fide, arm's length bargaining in pursuit of their own labor union policies and not at the behest of or in combination with nonlabor groups, such a provision falls within the protection of the national labor policy and is therefore exempt from the Sherman Act. *Jewel Tea*, 381 U.S. at 689–90, 85 S.Ct. at 1601–02. Justice White stated that the crucial determinant was not the form of the agreement—e.g., prices or wages—but its relative impact on the product market and the interests of union members. *Id.* at 690 n. 5, 85 S.Ct. at 1602 n. 5. Thus, *Jewel Tea* held that there will be no antitrust liability for union-employer agreements that are the result of the sort of arm's length bargaining—especially over mandatory subjects—that federal labor policy authorizes. *See Home Box Office, Inc. v. Directors Guild of America, Inc.*, 531 F.Supp. 578, 592 (S.D.N.Y.1982).

The Second Circuit adopted the *Jewel Tea* test in *Berman Enterprises Inc. v. Local 333, United Marine Division,* 644 F.2d 930 (2d Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981). *Berman* upheld a collective bargaining agreement that required a minimum of two workers on certain barges operated by members of the employer's association and that also required "affiliates" of association members to comply with the contract.

The challenged provisions of the agreement, said the Court, were designed to improve wages and working conditions and to protect jobs and promote safety. The provisions thus served "legitimate" union objectives and hence satisfied the *Jewel Tea* test. *Id.* at 935 n. 8.

In the instant case, plaintiffs argue that the individual collective bargaining agreements with shipowners operate to stifle competition. However, plaintiffs make no showing how ITF's alleged combination with shipowners conferred benefits on other shipowners other than benefits flowing naturally from the elimination of competition over wages and working conditions, that is, from union efforts to standardize the terms of employment. *See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Some labor agreements are so affirmatively sanctioned by labor law that their anticompetitive effects have no bearing on whether they come within the nonstatutory exemption. *Home Box Office,* 531 F.Supp. at 593 (the exemption applies to collective bargaining agreements negotiated at arm's length, limited to the bargaining unit, and covering subjects of bargaining recognized by statute as fundamental to the interests of unions). Indeed, plaintiffs have presented no evidence that the actions taken by the ITF and its affiliate unions were for any purpose other than their own self-interest including wages and benefits.[8]

■ This failure of plaintiffs is crucial since anti-trust liability attaches to a union combination with a non-labor entity only

---

**7.** The agreement in *Jewel Tea* forbade the sale of meat before 9 a.m. and after 6 p.m. in both service and self-service markets. *Jewel Tea,* 381 U.S. at 681, 85 S.Ct. at 1597. The complaint alleged that the self-service system of marketing meat had come into vogue, that 174 of Jewel's 196 stores were equipped to vend meat in this manner, and that a butcher need not be on duty in a self-service market at the time meat purchases were actually made. *Id.* at 682, 85 S.Ct. at 1598.

**8.** Plaintiffs do not allege, for example, that the alleged conspiracy with either Histadrut or the shipowners was explicitly for the purpose of

allowing them to charge higher prices or fees or to eliminate competition. Plaintiffs allege that the cooperating owners were able to trade their vessels to whichever port they chose, based only upon the availability and profitability of the business, knowing that in ITF "territory" any competing owners would either be paying the same wages or running the risk of having his ship seized by the ITF. *See* July 11, 1989, Plaintiffs' Memorandum of Law in Reply to Defendant's Motion for Summary Judgment ("Pltfs' Opposition Memo") at 16. However, plaintiffs acknowledge that ITF's goal was "to standardize the wages paid by FOC owners." *Id.* at 17.

when the goal of the combination is not limited to furthering the union's interests. In *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) the Court found that an agreement between the union and certain large coal mine operators violated anti-trust laws. The purpose of the agreement was to eliminate smaller companies by imposing wage and royalty scales upon them so that coal production would be limited and the market would be preempted by the large unionized operators. *Id.* at 664, 85 S.Ct. at 1590. The Court held that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. *Id.* at 665, 85 S.Ct. at 1591. Moreover, a union may unilaterally adopt a uniform wage policy, and without agreement with any employer group to do so, may seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The Court asserted that such union conduct is not sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. *Id.* at 665 n. 2, 85 S.Ct. at 1591 n. 2. There must be additional direct or indirect evidence of the conspiracy. *Id.*

Thus, *Pennington* established that a union forfeits its exemption from the anti-trust laws when it is clearly shown that it has agreed with a set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry; the union is liable with the employers only if it becomes a party to that conspiracy, even though the union's part in the scheme may consist of an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry. *Id.* at 665–666, 85 S.Ct. at 1590–91.

In the instant case plaintiffs have presented no evidence of a conspiracy of the sort outlawed in *Pennington*. Plaintiffs allege that FOC owners who had an ITF approved agreement "could" charge higher charter rates. Pltfs' Reply Memo at 17. Plaintiffs present no evidence that higher rates were charged. More importantly, however, they do not allege that the purpose of the agreement between ITF and the shipowners was to enable the owners to charge higher prices.

■ A union's activity is exempt even if its victory in its disputes adds to the cost of goods or results in individual refusals of all employers to buy equipment not made by the union. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503, 60 S.Ct. 982, 997, 84 L.Ed. 1311 (1940). If the union achieved this result alone, it would be the natural consequence of labor union activities exempted by the Clayton Act from the coverage of the Sherman Act. *Id.* Since the ITF acted in its self-interest, even if Local 6 and FOC shipowners were not able to compete, such a result would be the "natural consequence" of labor union activities so long as the ITF acted alone in obtaining the bargaining agreements. *Cf. Bodine Produce*, 494 F.2d at 558 n. 50 (labor exemption granted despite the fact that defendants solicited the aid of many non-labor groups and threatened economic ruin and used various kinds of illegal coercion and intimidation in obtaining agreements because the predominant purpose was to secure the union's recognition by plaintiff).

Therefore, in the instant case, even if plaintiffs were correct in alleging that defendants combined with non-labor groups, plaintiffs would also have to present facts showing that the combination was not intended primarily to further the ITF's self-interests in organizing the crews of ships, both FOC and otherwise. Plaintiffs have not presented such evidence. Therefore, we grant defendant's motion for summary judgment on plaintiffs' antitrust claim. Having done so we also dismiss defendant's antitrust counterclaim for the same reasons.[9]

9. Defendant suggested that its antitrust claim be dismissed if the plaintiffs' antitrust claim was dismissed. *See* July 11, 1989 Defendant's Opposition to Plaintiffs' Joint Motion for Summary Judgment at 17–18 ("Deft's Memo in Opposition").

## 2. *Tortious Interference with Contract*

Plaintiffs seek partial summary judgment as a matter of law on the issue of liability on their causes of action under New York State's law of tortious interference with an existing contract. Plaintiffs also seek summary judgment on the damages portion of defendant's counterclaim which alleges tortious interference with contract. Defendant makes a cross motion for summary judgment of plaintiffs' claim of tortious interference with a contractual relationship.

Plaintiffs assert that ITF is liable as a matter of law on Local 6 and ISA's claims of interference with an existing contract. Pltfs' Memo in Support of Summary Judgment at 22. Plaintiff Local 6 alleges that ITF's actions in blacking the Ocean Sky were intended to nullify Local 6's contract with the Ocean Sky, substitute an ITF contract for it, and "put an end to [Local 6's] involvement in f-o-c ships once and for all." Pltfs' Memo in Support of Summary Judgment at 13. Plaintiff contends that as a result of defendant's allegedly tortious actions, the crew was prevented from rendering their normal work contrary to their contract with Local 6, the owners of the Ocean Sky lost their next shipping contract, the contracts between Local 6 and the owners of the Ocean Sky and the Mia were not renewed at the end of their twelve-month term, and numerous other owners lost interest in signing contracts with Local 6 once the news of the blacking in Haifa became known in the shipping world.

Defendant argues that it is entitled to summary judgment as to the third cause of action because (a) there existed no valid contract between Local 6 and the owners of the four FOC vessels; (b) these tort claims are, in essence, labor disputes preempted by federal labor law; and, (c) plaintiff can show no damages.

■ The parties agree that a plaintiff seeking recovery for tortious interference with an existing contract must prove the following four elements:

1. the existence of a valid contract between plaintiff and another;

2. defendant's knowledge of that contract;

3. defendant's intentional interference with or procurement of the breach of that contract; and

4. damages.

*See Walters v. Fullwood,* 675 F.Supp. 155, 159 (S.D.N.Y.1987). Defendant does not dispute plaintiffs' assertion that it knew of the contract between Local 6 and the shipowners but it does assert that plaintiffs fail to satisfy the other essential elements.

### *Validity of Contract*

Defendant avers that no valid contract existed because the "formation and implementation of these [Local 6] 'contracts' make it clear that Local 6 never intended to represent the seamen of these FOC vessels." Deft's Memo in Support of Summary Judgment Motion at 30. Indeed defendant makes a strong argument that the Local 6 contracts were merely an attempt by Local 6 and the shipowners to circumvent the higher wages and working conditions mandated by ITF contracts.

In support of this contention defendant asserts that plaintiff failed to inquire as to the wages of the crew before the formation of the contract and failed to perform any traditional duties of a collective bargaining agent once the agreements were signed such as communicating with the crew it purported to represent or handling its grievances. *See Id.* at 30–31. Plaintiff does not dispute these contentions as to its performance or lack of it. *See* Plaintiffs' Joint Counter Rule 3(g) Statement at ¶¶ 17–18 (failing to respond to defendant's allegations in Paragraph 40 of defendant's 3(g) statement). However, it is our view that even accepting as true this apparent and troubling lack of diligence on the part of Local 6, it is inappropriate to resolve on summary judgment the question of Local 6's intention of representing the seamen of the FOC vessels and whether this conduct was consistent with an attempt by Local 6 and the shipowners to depress the wages and working conditions of the seamen. *See Schering Corp. v. Home Ins. Co.,* 712 F.2d

4, 10 (2d Cir.1983) (when intent is an issue, summary judgment is inappropriate).

## Intentional Interference

Plaintiffs allege that defendant ITF interfered with their existing contract by virtue of a) the ITF's alleged goal of "ending Local 6's involvement in FOC ships once and for all"; b) a work stoppage when the crew of the Ocean Sky were temporarily unable to perform their jobs in Haifa; and c) Local 6's alleged inability to provide benefits to the crew members due to ITF's actions.

With respect to Local 6's alleged inability to provide benefits, plaintiff does not cite any specific benefits which they did not provide due to ITF's actions. Plaintiff Local 6 states only that it could "honor its commitment to provide such benefits, and the ISA's member owners of the Ocean Sky and Mia could allow Local 6 to service their seafarers, only at the risk of encountering a boycott in the next port." Pltf's Memo in Support of Summary Judgment at 21. Given plaintiffs' inability to cite any evidence of benefits not provided, we reject this part of plaintiffs' argument.

Defendant asserts that there was no "work stoppage." We agree. Plaintiff ISA's own agent Evangelos Venturas admitted as much in his deposition. *See* July 11, 1989 Supplemental Affidavit [of Laura L. Carroll] in Support of Motion of Defendant International Transport Workers' Federation for Summary Judgment and in Refutation of Plaintiffs' Joint Motion for Summary Judgment ("Supp. Affid."), Exh. 51 at 130. Furthermore, plaintiffs do not present any evidence that anyone, whether related to ITF or not, made any efforts to prevent or even persuade the crew not to work.[10] There is no evidence to show that any cessation of work activities by the crew was due to anything other than the refusal of Israeli union members to provide services to the Ocean Sky, a refusal which was within their rights.[11]

Finally, with regard to ITF's alleged goal of putting Local 6 out of business, plaintiffs do not explain precisely why this goal would constitute tortious interference. Perhaps plaintiffs mean to assert that the evidence shows that ITF's sole motive was to inflict injury. In the past some courts have required that a plaintiff alleging tortious interference with contractual relations allege and prove exclusive malicious motivation. *See Sharma v. Skaarup Ship Management Corp.*, 699 F.Supp. 440, 446 (S.D.N.Y.1988) (Stanton, J.). However, as Judge Stanton noted in *Sharma* the New York Court of Appeals held in *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 448 (1980), that, because an existing contract was entitled to greater protection than pre-contractual relations, the fact that a defendant had a business motive will excuse his actions only in the case of interference with pre-contractual relations. *Id. Cf. Sullivan v. American Airlines, Inc.*, 613 F.Supp. 226, 232 (S.D.N.Y.1985) ("tortious interference with [an] employment contract.... is made out where a third party has unjustifiably interfered with a contractual relationship, and where such interference was motivated solely by malice and not merely incidental to some other lawful purpose.") (citations omitted). In other words, if the interferer acts with a business (competitive) motive as well with as a malicious one, the conduct may be actionable when there is an existing contract.

We apply here the approach taken by the New York Court of Appeals in *Guard–Life*. In that case the court noted with approval certain sections of the Restatement (Second) of the Law of Torts adopted in May, 1977. The fundamental principle of tortious interference with contract stated there is the following:

**10.** There is evidence that ITF representatives tried to get crew members to sign a statement indicating their "support" of Captain Groman of ITF. *See* May 30, 1989 Affidavit [of Laura L. Carroll] in Support of Motion of Defendant International Transport Workers' Federation for Summary Judgment ("Affid. of Laura Carroll"), Exh. 45.

**11.** See discussion below regarding whether a refusal to deal with another constitutes "improper" conduct and is thus actionable as a tort.

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. Restatement (Second) of Torts § 766 (1977).

The court in *Guard–Life* also noted with approval Section 767 of the Restatement which sets out several considerations for determining whether an intentional interference with a contract is "improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." Restatement (Second) of Torts § 767 comment b (1977). Factors to be considered include the nature of the conduct of the person who interferes (a chief factor in determining whether conduct is improper), the interest of the party being interfered with (whether in an enforceable contract or in a contract voidable and thus unenforceable or terminable at will), and the relationship between the parties. *Id.* (cited in *Guard–Life*, 428 N.Y.S.2d at 632, 406 N.E.2d at 448). Other factors include the motive and interests sought to be advanced by the one who interferes, the social interests in protecting the freedom of action of that person as well as the contractual interests of the party interfered with, and the proximity or remoteness to the interference of the conduct complained of. *Id.*

In the case of the ITF and Local 6 the relative significance of the factors involved include the ITF's interest in maintaining and furthering their efforts to improve the wages and working conditions of FOC crew members. The control ITF has won over the services in certain ports is an important part of the leverage it can use to obtain contracts with shipowners, contracts with undisputed higher wages than those in the Local 6 contracts. Ample evidence has been provided in this case of the ITF's campaign going back to the 1940s to organize FOC crews. On the other hand the interests of Local 6 and the FOC shipowners' interest is that of a competitor union which seeks to be able to sign contracts which will not be breached or interfered with through the improper conduct of another union.

Defendant ITF asserts that its activities were not improper because it was seeking to protect the interests of its union members. We agree that the motive and interests advanced by the ITF deserve protection, but there are material issues of fact in dispute as whether improper means were used. In our view the freedom of unions to refrain from providing their labor services to one who chooses to enter into contracts of inferior wages is a crucial tool that unions have used to further their interests. Furthermore, we do not want to burden worker organizing activity by the threat of tort liability for activity recognized worldwide as classic labor organizing, so long as improper means are not used.

In essence this case presents a situation in which one union's attempt to protect its members' interests by the practice of "blacking" conflicts with Local 6's effort to get into and stay in the business of signing contracts with FOC shipowners. This situation is similar to the conflict which arises between a director's duty to honor corporate contractual obligations and simultaneously to protect the stockholders' best interests. In that case directors are released from liability for the contract's dishonor when it results from an effort to protect stockholders, absent a malicious motive. *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.1988) (citing *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 686, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969)). In *American Protein* the Second Circuit held that corporate executives who decided to "wind down" the affairs of a subsidiary and terminate a contract with the plaintiff were not liable for tortious interference with contract. The court relied on *Felsen* for the proposition that terminating a corporate contract in furtherance of an equally important

right to act in its own economic interests justifies what would otherwise be actionable. *Id.*, (citing *Felsen*, 24 N.Y.2d at 687, 301 N.Y.S.2d at 613–614, 249 N.E.2d at 462–463).

The case at bar is also similar to *Burba v. Rochester Gas and Elec. Corp.*, 139 A.D.2d 939, 528 N.Y.S.2d 241 (4th Dep't), *appeal dismissed*, 72 N.Y.2d 914, 532 N.Y.S.2d 848, 529 N.E.2d 178 (1988), in which the utility company announced a policy that it would not allow employment of union members on property owned by it. The union members sued for intentional interference with their contract of employment with contractors. The court held that there was no cause of action because there was no breach of any contract and because the union agreements with contractors gave plaintiffs not a guarantee of employment but only a right to be considered for employment by contractors. *Burba*, 528 N.Y.S.2d at 242.

In the case of Local 6's contracts with the Ocean Sky and the Mia, no breach has been shown. The parties have cited no obligation, whether contractual, legal or otherwise, requiring the ITF affiliate union workers in Haifa to provide services to the Ocean Sky. Indeed those services would have been forthcoming if Local 6's representations of affiliation with ITF had been true. Like the union members in *Burba*, FOC shipowners with Local 6 crews had no guarantee of service in ITF-dominated ports. One may ordinarily refuse to deal with another, and the conduct is not regarded as improper. Restatement (Second) of Torts § 766 comment b (1977).

We decline to grant summary judgment, however, because a material issue of fact exists as to whether the ITF's conduct was entirely proper given the circumstances. In our view ITF's conduct was proper when it made efforts to ascertain whether the Local 6 blue member certificate was a bona fide symbol of a contract approved by ITF. The certificate itself asserted that Local 6 was affiliated with ITF.[12] ITF had an interest in making sure that assertion was true before according the Ocean Sky the privileges due to an FOC ship with an ITF-approved contract.

A material issue of fact exists as to whether the statement by Captain Groman warning of "further damages" to the Ocean Sky was intended or understood to be a threat of physical violence. *See Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir.1983) (when intent is an issue, summary judgment is inappropriate). This statement, together with the alleged forcible moving of the Ocean Sky to another berth in the port of Haifa, prompts us to deny summary judgment, allowing further factual development regarding these actions.

### *Labor Law Preemption*

█ Defendant argues, *inter alia*, that plaintiffs' business tort claims would be preempted and barred by federal labor law. *See Palm Beach Co. v. Journeymen's & Production Allied Services*, 519 F.Supp. 705, 715 (S.D.N.Y.1981). However, defendant also acknowledges that federal labor laws have been found not to extend to disputes which involve foreign flag vessels employing foreign crews. *See Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957). Nevertheless, defendant asserts that "were the dispute in this case subject to federal labor laws, plaintiff's business tort claims would be preempted and barred." Deft's Memo for Summary Judgment at 26. Defendant asserts that

---

**12.** For example, the Local 6 "blue member certificate" indicated below the signature, "Local 6, ILA Affiliated with AFL–CIO, CLC, ITF." *See* Affid. of Laura Carroll, Exh. 31–34. The Local 6 collective bargaining agreement also stated that "Local # 6 of the International Longshoremen's Association AFL–CIO ... [is] affiliated through its International Union ("ILA") with International Transport Workers Federation ("ITF")." *Id.*, Exh. 20. Even though it is true that Local 6 is a chapter of the ILA which is affiliated with the ITF, it does not follow that Local 6 is "affiliated with" the ITF because of the specific and well-known requirements of "affiliation" as set out by the ITF. William Perry admitted that he "knew all about [the ITF] policy [that FOC ships should be covered by agreements acceptable to the ITF]." Pltfs' Notice of Motion, Exh. AA.

the action taken by the ITF and its Israeli affiliate in "blacking" the Ocean Sky was a concerted activity that would clearly fall within the purview of the National Labor Relations Act as a classic "labor dispute." *Id.* Defendant argues that because of federal labor policy the applicability of state claims of tortious interference is restricted. Finally, defendant asserts that the limited exception to preemption for violent activities or personal torts would be inapplicable. *Id.*

State regulation of activity touching upon labor-management relations has been implicitly limited by Congress. *See Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 187, 98 S.Ct. 1745, 1752, 56 L.Ed.2d 209 (1978). It is well settled that the doctrine of labor law preemption is animated by the recognition that the purposes of the federal labor statutes would be defeated if both state and federal courts were free, without limitation, to exercise jurisdiction over activities that are subject to regulation by the National Labor Relations Board. *Id.* at 218, 98 S.Ct. at 1768 ("Congress created the centralized expert agency [the National Labor Relations Board] to administer the [National Labor Relations] Act because of its conviction—generated by the historic abuses of the labor injunction, ... that the judicial attitudes, court procedures, and traditional judicial remedies, state and federal, were as likely to produce adjudications incompatible with national labor policy as were different rules of substantive law.")

However, in the instant case the parties agree that the activities at issue are not subject to regulation by the National Labor Relations Board because it involves a foreign ship with a foreign crew. In *Benz v. Compania Naviera Hidalgo, S.A.,* the Supreme Court held that the Labor Management Relations Act ("LMRA") did not preempt a state law suit by foreign ship owners against American unions. The Court stated that the legislative history of the LMRA was a bill of rights for "*American* workingmen and for their employers," and that "the boundaries of the Act ... includ[e] only the workingmen of our own country and its possessions." *Id.* at 144, 77 S.Ct. at 703 (emphasis in original).[13]

In our view, if federal labor law is not applicable then the related policy consideration prohibiting state law claims disappears. The policy underlying the federal labor law preemption is to avoid inconsistent adjudications when state courts adjudicate state law claims that are also covered by federal labor laws, particularly those in the exclusive jurisdiction of the National Labor Relations Board. However, since federal labor law does not apply here, there is no possibility of arriving at adjudications in applying state common law to labor disputes that would differ from that achieved by applying federal labor law. Therefore, we reject as a matter of law defendant's argument that plaintiffs' tortious interference with contract claim should be dismissed because of preemption by federal labor law.

### Damages

 We decline to grant summary judgment to either party as a matter of law because there is a genuine issue of material fact as to whether either plaintiffs or defendant has suffered damages attributable to wrongful conduct.

Both parties argue that their opponent has failed to show damages. Plaintiff Local 6 asserts it suffered pecuniary damage when it incurred expenses in freeing the Ocean Sky from Haifa, when its next scheduled charter was cancelled,[14] and when the owners of the Ocean Sky, the Mia and the Cavourella did not renew their

---

**13.** The Supreme Court has also held that when the National Labor Relations Act is inapplicable to a labor dispute because of the dispute's "international complexion," state law may be applied. *See American Radio Ass'n v. Mobile Steamship Ass'n,* 419 U.S. 215, 228, 95 S.Ct. 409, 417, 42 L.Ed.2d 399 (1974); *Windward Shipping (Lon-*

*don), Ltd. v. American Radio Ass'n,* 415 U.S. 104, 115, 94 S.Ct. 959, 965, 39 L.Ed.2d 195 (1974); *Goethe House N.Y., German Cultural Center v. NLRB,* 869 F.2d 75, 79 (2d Cir.1989).

**14.** The damage claim for the cancelled charter is asserted only by plaintiff ISA.

contracts at the end of the contract's twelve-month term.[15] Defendant argues that it was damaged when Local 6 signed a contract with the owners of the Arma while it was still under contract with the ITF. As a result the owners of the Arma did not renew their contract with ITF (or its affiliate) at the end of its twelve-month term.

Plaintiffs say they suffered pecuniary loss because, *inter alia,* the Ocean Sky lost its next planned cargo job due to its delay in Haifa. Defendant argues that such a loss could be claimed only by the owners of the Ocean Sky, who are not a party to this suit. Plaintiff ISA counters that as an organization it may assert the claim of a member when the interest it seeks to protect is germane to the organization's purpose. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Plaintiffs state that ISA's primary function was the negotiation of collective bargaining agreements with labor unions. Pltfs' Memo in Support of Summary Judgment at 2.

■ At the time of the Ocean Sky's alleged loss of their next charter, the ISA had already performed its function of negotiating the collective bargaining agreement with Local 6. Because there is no connection between this function of ISA and the alleged cancellation of the next charter, we find that plaintiff ISA's claim of damages fails. Even if ISA could assert the damage claim of its member on this claim, ISA has failed to show that the cancellation of the next charter was caused by tortious conduct and not by the mere fact of delay.

With respect to all claims of damages, it must be shown that tortious conduct caused the damages. *See Merrill Lynch*

*Futures, Inc. v. Miller,* 686 F.Supp. 1033, 1040 (S.D.N.Y.1988) ("an essential element of a claim for tortious interference with contractual relations is that of causation."). For the following reasons we conclude that there are material issues of fact in dispute which are required in showing causation of damages to prove state law claims in labor disputes.

In state law claims of tortious interference arising from a labor dispute, the question of causation is crucial. In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court carefully limited the liability of unions for damages under state law claims allowed because of violence in order to accommodate federal labor policy. *Id.* at 729, 86 S.Ct. at 1140 ("the permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct, and does not include consequences resulting from associated peaceful picketing or other union activity.")

■ *Gibbs* was not the first time that the Court had restricted the scope of damages in a labor dispute. In *United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), the Court held that damages were restricted to those directly and proximately caused by wrongful conduct chargeable to the defendant.[16] Similarly, in *International Union, United Automobile, Aircraft and Agricultural Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) the Court noted that damages must have a proximate relation between the violence and threats of force and violence complained of and the loss of wages allegedly suffered. *Id.* at 638, 78 S.Ct. at 935.[17]

---

**15.** Plaintiffs do not seek summary judgment on the claim of interference with the existing contract covering the Cavourella. They contend that the loss of the renewal of that contract is relevant to this motion only on the issue of damages. Pltfs' Reply Memo in Support of Summary Judgment at 52 n. 5.

**16.** In *Laburnum* the union used intimidation and threats of violence to prevent a construction company employer from using its regular employees and forced it to abandon a construction

contract with consequent loss of profits. The Supreme Court upheld a judgment for about $30,000 compensatory damages and $100,000 punitive damages on a state law tort claim.

**17.** In *Russell* the Court upheld an award for compensatory damages for lost wages, mental anguish, and punitive damages to a non-union worker who was prevented from entering the building to work by picketing strikers who blocked the entrance. Strikers also threatened the worker with bodily harm and damage to his

When the object of a union's conduct is protected but the tactics used to attain that end are not, damages should be awarded only for the losses directly resulting from the unlawful activity. *See Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters,* 704 F.2d 1443, 1448 (9th Cir.1983).[18]

While we have decided above that federal labor law is not applicable in this case, we think that the principles governing damages in state law claims stemming from labor disputes are applicable for important policy reasons.[19] The policy behind the awarding of damages is to compensate the victim of wrongful conduct and to deter the wrongdoer. The difficulty in this case is that both legal and illegal conduct might have caused the injury of which the plaintiffs complain. That is, Local 6's alleged loss of contracts might have been due either to the peaceful refusal of the Israeli unions to provide services to the Ocean Sky, or to the mere fact of delay in port, or to the fear of the FOC ships being physically damaged. It is unclear whether the shipowners who refused to sign contracts with Local 6 did so as a direct result of the threatened violence or as a result of the inability of ships without an ITF agreement to obtain needed services in ports controlled by ITF-affiliated unions. Under *Gibbs, Laburnum* and *Russell,* a state law claim may be brought against a union for only those damages directly attributable to violent activity.

The breach of a contract standing alone is not sufficient to create liability for subsequent breaches by others of other contracts. *See Walters v. Fullwood,* 675 F.Supp. at 159. Here both parties point to mere non-renewals of contracts at the end of their stated terms. Such non-renewal cannot be the basis for damages on a claim for tortious interference with an existing contract since the renewal of a contract is by definition a prospective contractual interest. Accordingly, we reject both parties' assertions of damages resulting from non-renewals of their contracts unless it can be shown that the nonrenewal was caused by tortious conduct.

Accordingly, for the above reasons we grant summary judgment to defendant with regard to plaintiff ISA's claim of tortious interference with an existing contract. We decline to grant summary judgment to the other parties on the claim for tortious interference with existing contract.

### 3. Tortious Interference with Prospective Economic Advantage

Local 6 seeks summary judgment on its claim of tortious interference with prospective contractual relations and dismissal of the damages portion of defendant's counterclaim of tortious interference with contractual rights and pecuniary interests. In its fourth cause of action Local 6 claims that by blacking the Ocean Sky and instructing its affiliates not to recognize Local 6's contracts, ITF tortiously interfered with Local 6's prospective contractual relations with owners of FOC vessels. Pltfs' Memo in Support of Summary Judgment Motion at 23. Plaintiff alleges that by "blacking" the Ocean Sky, ITF prevented the renewal of the Ocean Sky and Mia contracts and the consummation of similar contracts with Mobil Oil Co. and United Fruit. *Id.*

▆ Defendant asserts that this tort, like interference with an existing contract, is a "business tort" providing a remedy for business wrongs among business entities and business individuals. Deft's Reply Memo in Support of Summary Judgment Motion at 19. As such it should not be applied to a labor organization engaged in classic labor activity. *Id.* at 27. Defendant concedes, however, that a tortious in-

---

property and one striker took hold of his automobile. *Id.* at 636, 78 S.Ct. at 934.

**18.** The right of a state to deal with violence in a labor dispute is to be distinguished from the federal antitrust exemption for violence during a labor dispute as articulated earlier in this decision.

**19.** Our holding above is that the federal labor law exemption is not applicable in this case because it involves foreign ships not governed by federal labor laws restricting state law claims. We may still be guided by the policies developed in our courts for analysis of damage claims arising from labor disputes.

terference claim is appropriate in a labor dispute when violence or other activity poses a threat to public order. *Id.; see United Mine Workers v. Gibbs*, 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966) ("[t]his Court has consistently recognized the right of states to deal with violence and threats of violence in labor disputes"); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).

■ The parties agree that the tort of interfering with prospective contractual relationships has more demanding requirements for establishing liability than those required for existing contractual relationships. *See Guard–Life*, 428 N.Y.S.2d at 632–633, 406 N.E.2d at 448–449 (1980) ("greater protection is accorded an interest in an existing contract ... than to the less substantive, more speculative interests in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer).") If the parties are competitors and the contract is terminable at will, to sustain a cause of action based on tortious interference there must be a showing of wrongful interference such as fraudulent representations or threats. *See Koeppel v. Schroder*, 122 A.D.2d 780, 505 N.Y.S.2d 666, 669 (2d Dep't 1986); *accord Seven Star Shoe Co. v. Strictly Goodies, Inc.*, 657 F.Supp. 917, 920 (S.D.N.Y.1987).

■ Defendant's counterclaim alleges unlawful interference with contract by virtue of Local 6's signing a contract with the owners of the Arma while it was still under an ITF contract. While there is some dispute as to whether the ITF contract was in effect at the time the Local 6 contract was signed, we dismiss defendant's counterclaim as a matter of law because the defendant does not allege that Local 6 used any wrongful means. As we discussed above, the New York Court of Appeals noted with approval the approach taken in the Restatement (Second) of Torts. Section 768 states that a competitor is protected from the consequences of interference with prospective contractual relationships if the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful. "Wrongful means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone even if it is knowingly directed at interference with the contract. *See* Restatement (Second) of Torts § 768, comment e; § 767, comment c (1977).

In the instant case, Local 6 and ITF are competitor unions vying to sign contracts with FOC shipowners. Since we dismiss plaintiffs' antitrust claim, we will not consider further whether any unlawful restraint of trade is effected. ITF asserts its activities were designed to advance its interests in signing and maintaining contracts with FOC shipowners. In our view a material issue of fact is in dispute as to whether the ITF used wrongful means, thus precluding summary judgment.

Plaintiffs contend that all those who declined to renew or to sign new contracts with them were motivated by the fear of blacking by the ITF. It is our view that there is the same issue of material fact in dispute here as in the previous claim for interference with an existing contract, namely whether Captain Groman's statement was a threat of physical violence and whether the shipowners' decisions not to renew were motivated by the threat of violence or by the equally crippling threat of a refusal to provide services to non-ITF ships. As we have stated above, the refusal to provide services is a permissible method used by a competitor labor union to achieve its goal of protecting the interests of its members. But the use of violence and threats of illegal force are "wrongful means" and may result in liability for the union if they are shown to have caused damage.

### 4. *Lanham Act*

Plaintiffs move for summary judgment solely on the damages portion of defendant's counterclaim under the Lanham

Act.[20] For the following reasons we deny plaintiffs' motion.

Defendant's second counterclaim is that the plaintiffs fraudulently used a blue certificate with the initials ITF, a symbol defendant contends is well known to the maritime world. Amended Answer ¶ 62. Defendant claims this use constitutes unfair competition which caused pecuniary loss and tended to destroy the name and reputation ITF has established in the maritime world. *Id.* ¶ 63. Defendant asserts that Local 6 "palmed off" its services as those of the ITF by holding itself out as approved by and affiliated with the ITF. Deft's Opposition Memo at 19. Defendants seek actual and punitive damages and attorney's fees. *Id.* Prayer for Relief, ¶ 3.

Defendant's counterclaim is based on the similarity between ITF's "blue certificate" and the certificate issued by Local 6 to shipowners with whom it signed a contract. The text of the two certificates is identical; blanks are provided for the names, dates, and signatures.[21]

The headings on the certificates are different. Local 6's certificate heading says in large type: "Local 6 International Longshoremen's Association," and in smaller type just below, "Affiliated with AFL–CIO–CLC–ITF," followed by its address. Deft. Exh. 33. The heading of the ITF certificate also has its initials "ITF" followed by its full name in large type, and its address. Deft. Exh. 35. The Local 6 certificate is on paper of a similar blue color as the ITF certificate.

The Lanham Act is designed to protect the public and trademark owners. *See Coca–Cola Co. v. Stewart,* 621 F.2d 287, 290 (8th Cir.1980). Among other things the statute prohibits "passing" or "palming" off—i.e., selling another's goods as those of the trademark owner by using the owner's mark. *Id.* (citing *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir.1968)).

Specifically, Section 43(a) of the Lanham Act forbids the use of any false descriptions or representations, including words or other symbols, in connection with any goods and services in commerce. 15 U.S.C. § 1125(a). This provision protects unregistered marks.

The Second Circuit has adopted a two-step test for determining whether an unregistered mark has been infringed. *See Yarmuth–Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990, 992 (2d Cir.1987). First, a plaintiff must demonstrate that his mark merits protection under the Lanham Act. *Id.* (citing *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985)). Second, if the mark is protectible, the plaintiff must establish the likelihood of confusion, that is, "that an appreciable number of ordinarily prudent purchasers are likely to be misled or indeed simply confused, as to the source of the goods in question." *Id.* at 993 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). A "likelihood of confusion" is determined by many factors, including the following:

> the strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* (quoting *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)).

Plaintiffs assert that the damages portion of defendant's counterclaim should be dismissed because ITF has not shown that it suffered actual damages nor that consumers were actually confused. Pltfs' Re-

---

20. Since plaintiffs raise no other issues regarding the Lanham Act claim except those relating to damages, we pass only on the damages issue.

21. The text of the ITF certificate reads: "It is hereby certified that the (name of ship) is covered by agreements acceptable to the International Transport Workers' Federation. This certificate valid to (date)."

4ply Memo at 64. Based on the above case law we conclude that defendant ITF must demonstrate only a "likelihood" of confusion. Actual confusion is but one element of showing a likelihood.

In response to the argument that defendant has not shown actual damages, defendant counters by asserting that it is entitled to the same damages as provided under Section 1117 of the Lanham Act, which allows recovery of the profits derived by the infringing party as a result of the unfair competition. Deft's Opposition Memo at 20. Defendant points to the payment of $8500 to Local 6 and another payment to ISA for each of the vessels with which it signed a contract. *Id.* at 21. Defendant claims it would be entitled to these "unfair profits" if it prevails on its Lanham Act claim.

The plaintiffs argue essentially that because the defendant did not suffer money damages, no damage award is permitted. However, monetary relief may be awarded even in the absence of actual damages suffered by the trademark owner. *See Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*, 580 F.Supp. 634, 636 (S.D.N.Y.1984). In our case the trademark owner (ITF) claims the "profits" earned by Local 6 and ISA through use of the blue certificate. "The awarding of profits is designed to be a deterrent to those who would wilfully infringe a competitor's mark." *Id.* (quoting *Vuitton et Fils, S.A. v. Crown Handbags*, 492 F.Supp. 1071, 1077 (S.D.N.Y.1979), *aff'd*, 622 F.2d 577 (2d Cir.1980)), (citing *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir.1970)). In a suitable case the profits may be recovered without demonstrating actual damages. *Id.* (quoting *Vuitton*, 492 F.Supp. at 1077).

Furthermore, we note that in a false designation of origin case under Section 1125(a) damages may include harm to one party's reputation or goodwill caused by the actions of the other party. *See Burndy Corp. v. Teledyne Industries, Inc.*, 748 F.2d 767, 771 n. 1 (2d Cir.1984).

Nevertheless, the mere act of infringement does not automatically entitle the trademark owner to an accounting. *Id.*

The trial court must fashion the relief to the general equities of the situation. *Id.* In *W.E. Bassett Co. v. Revlon, Inc.*, the Second Circuit held that "[a]n accounting should be granted if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary to deter a willful infringer from doing so again." *W.E. Bassett*, 435 F.2d at 664.

We agree that at trial the defendant may be able to show that the infringement was so willful so as to warrant an accounting. Therefore, we deny plaintiffs' motion to dismiss the damages part of the Lanham Act claim.

CONCLUSION

We grant summary judgment to defendant on the antitrust claims of plaintiffs Local 6 and ISA and dismiss defendant's antitrust counterclaim. We grant summary judgment to defendant on plaintiff ISA's claim of tortious interference with contract. We grant summary judgment to plaintiff on defendant ITF's first counterclaim which alleges tortious interference with contractual relations and prospective economic advantage. We deny summary judgment with respect to all other claims.

SO ORDERED.